[Cite as *MacKnight v. MacKnight*, 2022-Ohio-648.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| ERIC MacKNIGHT, | : | |
| Appellant, | : | CASE NO. CA2021-07-078 |
| | : | O P I N I O N |
| - vs - | | 3/7/2022 |
| | : | |
| TARA MacKNIGHT, | : | |
| Appellee. | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. DR19-03-0253

Mark W. Raines, for appellant.

Hedges and Yauch, L.L.C., and Elizabeth Ann Yauch, for appellee.

**HENDRICKSON, J.**

{¶1} Appellant, Eric MacKnight ("Father"), appeals from a decision of the Butler County Court of Common Pleas, Domestic Relations Division, which ordered him to pay child support and spousal support to appellee, Tara Ruttencutter f.k.a. Tara MacKnight ("Mother"), following the parties' divorce. For the reasons that follow, we affirm the trial court's decision.

{¶2} The parties were married in March 2009, and two children were born issue of

the marriage: L.M., born in 2011, and J.M., born in 2013. In March 2019, following ten years of marriage, Father filed a complaint for divorce. Mother subsequently filed an answer and counterclaim for divorce.

{¶3} A final hearing on the complaint and counterclaim was held on February 23 and 24, 2021. At the start of the hearing, the parties indicated they had reached an agreement on a number of issues involving their children and the division of marital property and debt. The parties provided the court with a list of joint stipulations and an agreed shared parenting plan. The shared parenting plan named both Mother and Father as residential parents of the children and set forth a repeating 4-week schedule for parenting time. Pursuant to the parties shared parenting plan, parenting time would be split as follows during the school year:

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| **Week 1** | Mother | Mother | Mother / 8:00 P.M. Father | Father | Father | Father | Father |
| **Week 2** | Father | Father / 8:00 A.M. (or after school) Mother | Mother / 8:00 P.M. Father | Father | Father | Father / 8:00 A.M. (or after school) Mother | Mother |
| **Week 3** | Mother | Mother | Mother / 8:00 P.M. Father | Father | Father | Father | Father |
| **Week 4** | Father | Father / 8:00 A.M. (or after school) Mother | Mother / 8:00 P.M. Father | Father | Father | Father / 8:00 A.M. (or after school) Mother | Mother |

During the children's summer break from school, the parenting schedule deviated slightly,

with Mother's parenting time on Weeks 2 and 4 beginning on Sunday evenings at 8:00 p.m. rather than on Monday mornings at 8:00 a.m. Father was designated the residential parent for school purposes.

{¶4} Though the parties had reached an agreement on a number of issues, disputes remained with respect to the issues of spousal support, child support, and the allocation of certain expenses related to the children, including school fees, the costs of extracurricular activities, and childcare fees. Mother and Father were the only witnesses to testify at the final hearing about these issues. Their testimony, as well as the numerous exhibits admitted into evidence, established the following relevant facts.

{¶5} Father is 40 years old and has no significant health issues. He has both a bachelor's degree and a master's degree in engineering. Since 2013, Father has been employed by General Electric (GE) and he now works as a software engineer for GE Aviation. Father's annual base salary is equal to $133,569, with the potential to earn annual bonuses based on his company's performance and his individual contributions. Overtime hours are uncommon for Father. Father makes elective deferrals to a retirement account.

{¶6} According to Father's W-2s, he made the following sums annually: $100,515.71 in 2017; $117,532.98 in 2018; $135,441.02 in 2019; and $166,005.79 in 2020.[1] Father's 2020 income included a performance bonus of $32,436.79. Father indicated it was the largest bonus he has received from GE. In the proceeding years, his earned bonuses were smaller: $8,332.98 in 2018 and $22,782.10 in 2019. Father expected his 2021 bonus to be significantly lower than his 2020 bonus, due to the effects the Covid-19 pandemic had on GE.

{¶7} Father testified that during the Covid-19 pandemic, he began working from

---

1. The "Box 5 Medicare wages and tips" numbers from Father's W-2 s were used by the court in determining the parties' income.

home.  Regardless of whether he works from home or the office, it is necessary for Father to have after school care and summer workday care for the children.  Father stated his annual childcare expense is $4,200.

{¶8}    Mother is 39 years old and has no significant health issues.  Mother is a "diploma nurse" who has been employed at Cincinnati Children's Hospital since 2004.  Mother works three 12-hour shifts per week.  Mother's base pay is $38.18/hour.  She is paid "SRU pay," which is specific to a unit at the hospital.  She receives an additional $5.00/hour for SRU, weekend, and night shifts.  Mother earns training pay, overtime pay at time and a half, paid time off, family and medical leave – if necessary, and holiday pay.  During the Covid-19 pandemic, Mother's pay was categorized as "temporary emergency at 80% pay," "temporary emergency at no pay," or "temporary emergency at 100% pay" depending on the hospital's situation or need.  Any bonus Mother earns is institutionally driven.

{¶9}    According to the "Box 5 Medicare wages and tips" portion on Mother's W-2s, she made the following sums annually:   $81,568.10 in 2017; $78,020.77 in 2018; $72,611.31 in 2019; and $68,621.57 in 2020.   However, Mother's gross wages were $91,440.47 in 2018, $86,210.33 in 2019, and $81,369.84 in 2020.  Mother makes voluntary deductions or elections from her pay as she contributes to a health savings account and to a retirement savings plan.  Mother's total gross pay for the month of January 2021 was $9,343.84.

{¶10}  In 2015, Mother started pursuing a bachelor of science in nursing degree ("BSN") by taking online classes.  Mother subsequently received a scholarship from her employer for the RN to BSN Cohort Program.  When she was only a few credits short of completing her BSN, Mother gave up the scholarship and stopped attending classes.  Mother testified that over the past few years she had found the schoolwork to be very taxing and difficult to accomplish with her other obligations to work and family.  Mother indicated

she intends to complete her degree one day, but she does not believe earning her BSN will significantly increase her opportunities at work unless she transitioned into an administrative or management position. Mother does not desire a management position; she enjoys helping children and families and would prefer to continue providing direct patient care.

{¶11} In September 2019, Mother received a disciplinary warning from work due to employee misconduct. Mother stated that years ago she had unknowingly and mistakenly removed drugs from the hospital in violation of the hospital's policy. Rather than immediately returning the drugs to the hospital, Mother put the drugs inside a plastic bin at the marital home. The drugs remained in the bin for a number of years, until Father called the police to report the drugs. Mother denied that receiving the disciplinary warning from the hospital affected her advancement or wage income, noting that the warning only remained in effect for a year and had ended in September 2020.

{¶12} Mother testified that the Covid-19 pandemic, the divorce, and a diabetes diagnosis for one of the children led to an emotionally difficult time. By the time of the final hearing, Mother was doing much better. Mother testified that with the way her work week and the parenting time schedule are structured, she is able to care for the children during her parenting time and does not have any daycare expenses. Mother testified she provides healthcare insurance for the children, paying $6,364.02 annually.

{¶13} Father testified about his belief that Mother was intentionally not working to her full potential as a way of obtaining additional support in the divorce. Father indicated Mother had voluntarily stopped pursuing her BSN and stopped working extra shifts at the hospital to decrease her income. In support of his belief, Father relied, in part, on a text message Mother sent him in October 2019, wherein Mother stated, "I'm not working more so you can have half." Mother, however, denied that she intentionally sought to reduce her

income by working less hours at the hospital or by stopping her pursuit of her BSN. Mother stated that the Covid-19 pandemic affected the number of hours she was able to work, noting that at times the hospital had mandatory call-offs.

{¶14} Mother and Father testified that the children are doing well and are involved in several extracurricular activities and sports. Both children take taekwondo lessons, J.M. plays school sports and select soccer, and L.M. plays volleyball. The children are also engaged in counseling services and take prescribed medications for their mental health. One of the children was recently diagnosed with type 1 diabetes, which requires medication, the use of monitoring devices, training, and extra care.

{¶15} Mother and Father also testified as to their standard of living during the marriage. Father testified they had a very good standard of living, in large part because they were thrifty and prudent consumers. Father stated the family took numerous vacations, going on cruises and traveling to Yellowstone National Park and Florida. Father indicated most of the vacations were done "on a poor man's budget."

{¶16} Mother acknowledged that she also attempted to be thrifty throughout the marriage, especially as it related to purchasing clothing and other shopping items. However, Mother stated that the parties' lifestyle permitted self-care luxuries, such as regular manicure and salon appointments. Mother expressed concern that she and the children would be unable to afford the same type of lifestyle without financial assistance from Father. Mother sought spousal support in the amount of $1,600 a month and a percentage of Father's yearly bonus pay. To support her request, Mother claimed she had monthly expenses totaling over $7,800. She introduced an exhibit in which she set out the monthly costs associated with housing, utilities, healthcare costs, dining out, groceries, gasoline, vacations, vehicle insurance, maintenance and repair, laundry, personal grooming expenses, enrichment expenses, parking fees, and the children's school fees, school

lunches, and school costs. Her claimed expenses also included items such as tanning, shopping trips, the purchase of event attire, entertainment subscriptions, and money for gifts and other discretionary items. Mother asserted she spent approximately $1,000 a month on food and dining alone.

{¶17} After considering Mother's and Father's testimony, the trial court issued a decision in which it found that Mother and Father were working to their full potential and that Mother was "employed to her full capacity." The court considered the factors set forth in R.C. 3105.18(C), specifically noting the parties' ages, education, standard of living during the marriage, earning ability, health, retirement benefits, property division, duration of marriage, and disparity of income and earning ability, and found that a spousal support order in favor of Mother was appropriate and reasonable. Reiterating that Father had an annual base salary of $133,569 and his bonuses were $8,332.98 in 2018, $22,782.10 in 2019, and $32,436.79 in 2020, the trial court ordered Father to pay Mother spousal support in the amount of $720 a month ($8,640 a year), plus an additional 30 percent of his gross bonus pay for a period of 42 months. In arriving at the 30 percent figure for bonus pay, the court noted that Father's bonus pay was "significant" and led to the "relative earning capacity of the parties [being] * * * vastly unequal." The court found that a "calculation based upon an average past bonus/incentive and salary pay would be too speculative" and determined 30 percent was an appropriate percentage.

{¶18} The court further found that Father should be designated as the child support obligor. In calculating his child support obligation, the court determined Father had an annual gross income of $133,569. The court then averaged Father's bonus pay for the last three years and added the average sum of $21,183.96 to Father's gross income to find that Father had a total annual gross income of $154,752.96. The court then deducted the sum of $8,640, which represented the spousal support award Father was ordered to pay Mother,

and arrived at an adjusted gross income of $146,112.96 for Father. Mother's adjusted gross income was calculated to be $83,645.82, which included Mother's annual gross income of $81,369.84 with an addition of $8,640 for the spousal support income and a deduction of $6,364.02 for healthcare insurance. Father, therefore, made 63.59 percent of the parties' combined annual gross income, whereas Mother only made 36.41 percent.

{¶19} With respect to Father's child support obligation, the court found that Father was entitled to a 10 percent downward deviation for extended parenting time under R.C. 3119.051, as Father's parenting time exceeded 90 overnights. After granting Father the 10 percent statutory deviation, the basic child support schedule provided that Father should pay Mother $1,338.61 as child support, $41.20 as cash medical support, and $27.60 as the statutory processing fee. The trial court found the amount of guideline child support and cash medical support was unjust, inappropriate, and not in the best interest of the minor children. The court considered the deviation factors set forth in R.C. 3119.23, and noted that Father spent approximately 228 overnights with the children during the year. Based on Father's extended overnight parenting time, the court determined that an additional deviation of $535.44 in child support and a full deviation of the cash medical support was appropriate. Father's child support obligation was therefore reduced to a total of $819.23 per month, which represented $803.17 in child support, $0 in cash medical support, and $16.06 in statutory processing charges.

{¶20} The trial court also allocated certain expenses related to the children that were disputed by the parties. The court determined that all non-tuition, mandatory school or class-related fees and necessary back-to-school needs, including required school supplies, were to be paid 100 percent by Mother. The cost of after-school care or summer workday care was to be paid by the party requiring such care, and the $4,200 Father testified he spent per year on childcare was entered into the child support worksheet when the court

determined Father's child support obligation. Finally, the court held that expenses for agreed upon extracurricular activities for the children were to be paid in accordance with the parties' income share, with Mother paying 36 percent and Father paying 64 percent of the expenses. Expenses for activities that were not agreed upon by both parents were to be paid solely by the parent that enrolled the child in the activity.

{¶21} A judgment entry and decree of shared parenting and a judgment entry and decree of divorce were issued by the trial court on June 9, 2021. Father timely appealed, raising three assignments of error. As Father's first two assignments of error are related, we address them together.

{¶22} Assignment of Error No. 1:

{¶23} THE TRIAL COURT ERRED WHEN IT NAMED [FATHER] OBLIGOR.

{¶24} Assignment of Error No. 2:

{¶25} THE TRIAL COURT'S DEVIATION FROM THE CHILD SUPPORT WORKSHEET WAS INADEQUATE.

{¶26} In his first assignment of error, Father argues the trial court erred when it named him the child support obligor as he is the residential parent for school purposes and has significantly more parenting time than Mother, spending approximately 228 overnights with the children compared to Mother's 137 overnights. Father contends that because of the amount of parenting time he has with the children, resulting in greater day-to-day responsibility and financial expense, he should have been named the child support obligee. Father concedes, however, that the child support statutes do not provide guidance in designating the child support obligor and obligee in shared parenting situations where both parents are named residential parents. Nonetheless, he argues that the trial court abused its discretion in designating him the obligor without providing any reason or justification for doing so. In his second assignment of error, Father argues that even if the court properly

designated him the obligor for child support purposes, the court should have deviated his child support obligation to $0 given that he has "significantly more day-to-day parenting" time with the children.

{¶27} "A domestic relations court has wide discretion regarding child support obligations, and the decision of the trial court will not be disturbed absent an abuse of discretion." *Lykins v. Lykins*, 12th Dist. Clermont No. CA2020-03-009, 2021-Ohio-274, ¶ 34, citing *Booth v. Booth*, 44 Ohio St.3d 142, 144 (1989). An abuse of discretion is more than an error of law; it implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶28} R.C. 3119.02 governs the calculation of child support, stating that a parent's obligation shall be calculated "in accordance with the basic child support schedule, the applicable worksheet, and the other provisions of Chapter 3119. of the Revised Code." In situations where one parent is the sole residential parent, R.C. 3119.07(A) provides that the nonresidential parent shall be named the child support obligor. However, this is a shared parenting situation, where both parents have care, custody, and control of the children and are deemed the "residential parents and legal custodians" of the children. See R.C. 3109.04(L)(5) and (6).

{¶29} R.C. 3119.24 applies in cases involving shared parenting plans. The statute provides, in relevant part, the following:

> A court that issues a shared parenting order in accordance with section 3109.04 of the Revised Code shall order an amount of child support to be paid under the child support order that is calculated in accordance with the schedule and with the worksheet, except that, if that amount would be unjust or inappropriate to the children or either parent and therefore not in the best interest of the child because of the extraordinary circumstances of the parents or because of any other factors or criteria set forth in section 3119.23 of the Revised Code, the court may deviate from that amount.

R.C. 3119.24(A)(1).  The statute does not mandate which residential parent is to be named the obligor or obligee in shared parenting situations.

{¶30}  Though Father acknowledges there is no specific rule that a parent with more parenting time be named the obligee in shared parenting situations, he nonetheless contends that language in R.C. 3119.231 "implies this should be the practice."  R.C. 3119.231 provides that a trial court "shall consider" whether to grant a child support deviation for parents having parenting time exceeding 90 overnights per year.  R.C. 3119.231(A).  The statute further provides that where court-ordered parenting time "is equal or exceeds one hundred forty-seven overnights per year, and the court does not grant a deviation under division (A) of this section, it shall specify in the order the facts that are the basis for the court's decision."  R.C. 3119.231(B).  Father argues the language in R.C. 3119.231 "strongly presumes" that the child support obligee will be the parent responsible for most day-to-day parenting.  Father's argument is without merit.  Nothing in R.C. 3119.231 provides that a certain level of extended parenting time eliminates that parent's obligation to pay child support or identifies which parent should be the child support obligee based on a comparison of the parents' respective parenting time.  The statute merely mandates that a trial court consider certain levels of extended parenting time as a basis of deviating from worksheet calculated child support.

{¶31}  In any event, the difference between Father's and Mother's parenting time is not as stark as Father represents.  The shared parenting plan sets forth a repeating four-week, or 28-day, parenting schedule.  Pursuant to the schedule, the children spend 10 nights with Mother and 18 nights with Father every 28 days during the school year.[2]

---

2. During summer break, the children spend an additional two nights with Mother during the 28-day schedule, for a total of 12 nights, as Mother's parenting time begins at 8:00 p.m. on Sunday evenings during Weeks 2 and 4 of the parenting schedule.

However, pursuant to the schedule, when the children transition from Father's care to Mother's care, the exchange occurs at 8:00 a.m. or after the children are released from school, but when transitioning from Mother's care to Father's care, the exchange occurs at 8:00 p.m. Thus, pursuant to the 28-day schedule, on four of the evenings the children are with Father overnight, they have spent the day in Mother's care. The schedule, therefore, essentially has the children spending the day in the custody of each parent equally (14 days each) during the 28-day cycle. Thus, Father's contention that he has significantly more parenting time with the children is inaccurate.

{¶32} Father asserts that the trial court erred in designating him the child support obligor as the court did so without explaining the basis of its decision. In support of his decision, Father relies on *In re K.R.B.*, 8th Dist. Cuyahoga No. 105084, 2017-Ohio-7071 and *Fallang v. Fallang*, 109 Ohio App.3d 543 (12th Dist.1996). In *In re K.R.B.*, the Eighth District reversed a trial court's child support order where the trial court failed to explain the basis for designating a father as the child support obligor in a shared parenting situation where the parents had roughly equal parenting time and similar gross incomes. *In re K.R.B.* at ¶ 21 and 23. The court of appeals observed that "[t]his is not a case in which the juvenile court's reasoning [in naming the father obligor] can be discerned from its analysis of the relevant R.C. 3119.23 factors or its statement of the facts in and of itself." *Id.* at ¶ 22. The court continued by noting that

> [w]e are by no means suggesting that a juvenile court's explanation of its child support determination need be so specific or detailed as to support, dollar-by-dollar, the particular child support obligation imposed by the court. *See Lopez-Ruiz v. Botta*, 10th Dist. Franklin No. 11AP-577, 2012-Ohio-718, ¶ 7. But there must be sufficient information in the juvenile court's journal entry imposing child support (or otherwise in the record) to allow a reviewing court to discern why the juvenile court did what it did and why it determined its decision was in the best interest of the child. Without such information, we are unable to properly assess whether the juvenile court's decision was the

product of a sound reasoning process or was unreasonable, arbitrary or unconscionable.

*Id.* at ¶ 25.

{¶33} In *Fallang*, this court considered a situation where the father in a shared parenting situation was designated the child support obligor. *Fallang*, 109 Ohio App.3d at 547. The father argued that because he and the children's mother shared parenting equally, naming him the obligor was gender discrimination and denied him of his due process and equal protection rights. *Id.* We rejected his arguments, holding in relevant part the following:

> The trial court has considerable discretion in determining support awards and the court's discretion will not be disturbed absent an abuse of discretion. * * * [W]here a trial court follows the statutory guidelines for calculating child support set forth in in R.C. 3113.215, designating one parent – particularly one who earns significantly more than the other – as "obligor" in a shared parenting situation is not *ispo facto* unconstitutional or an abuse of discretion.

Id.

{¶34} Unlike in situation in *In re K.R.B.*, the trial court's journal entry imposing child support and the record from the final hearing on divorce provide a basis for the trial court's decision to name Father the obligor. The trial court properly applied the child support guidelines for calculating the parties' income and determined Father's adjusted annual gross income was $146,112.96 and that Mother's adjusted annual gross income was $83,645.82. Father makes significantly more income than Mother. This fact, combined with the fact that the parties have roughly equal parenting time when accounting for the daytime hours Mother exercises parenting time, supports the trial court's decision to designate Father obligor for child support purposes. "[W]here a trial court follows the statutory guidelines for calculating child support, designating one parent, particularly the one who earns significantly more than the other, as obligor in a shared parenting situation

is not an abuse of discretion." *Sexton v. Sexton*, 10th Dist. Franklin No. 07AP-396, 2007-Ohio-6539, ¶ 12. The fact that Father was named the residential parent for school purposes does not change the result. Father's status as residential parent for purposes of determining what school district the children will be enrolled in no way affects the determination of child support obligor. Father's arguments are without merit and his first assignment of error is, therefore overruled.

{¶35} Father's arguments that the trial court erred in determining the amount of his child support obligation are also without merit. Father argues the trial court should have deviated his child support obligation to $0 given that he has significantly more overnight parenting time with the children, has to pay $720 a month in spousal support to Mother, Mother is voluntarily underemployed, he is responsible for paying for 64 percent of the children's activity costs, and he provided financial support during the marriage to a child Mother had from a previous relationship.

{¶36} R.C. 3119.051(A) provides that a court shall reduce a parent's child support order by 10 percent if the court issues an order directing parenting time that equals or exceeds 90 overnights per year. If the parent's parenting time exceeds 90 overnights per year, the court has the discretion to grant an additional deviation under R.C. 3119.231(A). R.C. 3119.231 works in combination with R.C. 3119.22 and 3119.23, which are statutes that "address a court's discretion to grant a deviation from a child support obligation after consideration of factors set forth in R.C. 3119.23 and upon a finding that child support according to the child support schedule and worksheet would be 'unjust, inappropriate and therefore not in the best interest of the child.'" *In re M.C.*, 12th Dist. Clermont No. CA2021-03-010, 2021-Ohio-3703, ¶ 9. "Extended parenting time or extraordinary costs associated with parenting time" is one of the factors the trial court is to consider in deciding to grant a deviation. See R.C. 3119.23(C).

{¶37} Here, Father's child support obligation was reduced twice by the trial court. The court first granted a 10 percent deviation in accordance with R.C. 3119.051 as Father had parenting time that exceeded 90 overnight per year. The court then determined an additional deviation was warranted under R.C. 3119.23(C) based on Father's "extended overnight parenting time." The deviation under R.C. 3119.23 reduced Father's child support obligation from $1,407.41 to $819.23, which represented $803.17 in child support, $0 in cash medical support, and $16.06 in statutory processing charges.

{¶38} The amount of the deviation ordered by the trial court was appropriate and not an abuse of the court's discretion. As discussed above, Father does not have significantly more day-to-day responsibility or costs associated with the care of the children, as the daytime parenting by the parties is approximately equal. Though the children sleep at Father's home more often than they sleep at Mother's home, Father acknowledged there was "probably not much" of an extra cost associated with having the children sleep at his residence after they are dropped off at 8:00 p.m. Given the amount of time that the children spend in Mother's care and the expenses associated with caring for the children's needs, the trial court's decision that it was in the children's best interest for Father to pay $819.23 a month in child support is supported by the record. Furthermore, in calculating Father's child support obligation, the trial court considered the amount of spousal support Father was ordered to pay Mother. This amount is reflected on lines 6 and 11 of the child support worksheet. The trial court was not required to further reduce Father's child support obligation on the basis of the spousal support order.

{¶39} As for Father's arguments that Mother was underemployed and not working to her full potential, these arguments were considered and rejected by the trial court. "Whether a person is voluntarily underemployed and the amount of income to be imputed 'are matters to be determined by the trial court based upon the facts and circumstances of

each case.'" *McFarland v. McFarland*, 12th Dist. Butler No. CA2018-05-098, 2019-Ohio-2673, ¶ 11, quoting *Rock v. Cabral*, 67 Ohio St.3d 108 (1993), paragraph one of the syllabus. We cannot say that the court abused its discretion in determining Mother was "working to her potential and employed to her full capacity." Mother's trial testimony, her paystubs, and her W-2s demonstrate Mother's steady and consistent employment at Children's Hospital over the years. Though Father contends Mother could earn a higher salary if she completed her BSN, the law does not require that a fully employed parent obtain a bachelor's degree. Mother is working in the same capacity as she did during the marriage.

{¶40} Father's argument that he should have a lower child support obligation because of the court's order that he pay 64 percent of the children's activities is also without merit. Father's responsibility to pay for 64 percent of the children's agreed upon activities is a function of his higher income. The court apportioned payment for agreed upon activities in accordance with the parties combined income share – where Father earned 64 percent of the parties' combined income, compared to Mother's 36 percent share of the combined income. Minimal testimony was offered by the parties about the specific cost of the children's agreed upon activities, including J.M.'s select soccer participation. Given the record before us, we find that the trial court did not err in allocating the cost of agreed upon extracurricular activities in the manner it did. Father's 64 percent allocation of such costs does not warrant a deviation of child support to $0 or any other lesser amount than that ordered by the trial court.

{¶41} Finally, Father has argued that his support of a child Mother had from a previous relationship is a factor that should reduce his child support obligation. Father contends that because Mother's oldest child, who is now an emancipated adult, was supported with marital funds and "benefited from [Father's] support" during the marriage, a

deviation of child support to zero was warranted. We find no merit to his argument. The court's order of $819.23 a month in child support is intended to benefit L.M. and J.M. It does not benefit Mother's emancipated adult child or Mother. *See Nelson v. Nelson*, 65 Ohio App.3d 800, 804 (11th Dist.1989). Father's past financial support of his former stepchild in no way warrants a deviation of his child support obligation to L.M. and J.M.

{¶42} For the reasons set forth above, we find that the trial court did not err in ordering Father to pay $819.23 a month in child support. Father's second assignment of error is overruled.

{¶43} Assignment of Error No. 3:

{¶44} THE TRIAL COURT ERRED TO THE PREJUDICE OF [FATHER] WHEN IT ORDERED SPOUSAL SUPPORT BE PAID TO [MOTHER].

{¶45} In his final assignment of error, Father argues the trial court abused its discretion in ordering him to pay Mother spousal support as the totality of the factors set forth in R.C. 3105.18 do not support such an award. He contends that the evidence introduced at the final hearing demonstrated Mother is "voluntarily underemployed, has significant earning ability and [has] significant employer benefits that make the parties near equal in income." He further maintains that Mother intentionally decreased her income for purposes of the divorce as a means of receiving a spousal support award.

{¶46} "A trial court has broad discretion in determining to award spousal support as well as the amount and duration of such award, based on the facts and circumstances of each case." *Spillane v. Spillane*, 12th Dist. Butler No. CA2019-12-206, 2020-Ohio-5052, ¶ 12, citing *Curry v. Curry*, 12th Dist. Butler No. CA2016-07-136, 2017-Ohio-8127, ¶ 15. Absent an abuse of discretion, a spousal support award will not be disturbed on appeal. *Id.*

{¶47} "A trial court has a statutory duty to base a spousal support award order on a careful and full balancing of the factors in R.C. 3105.18(C)(1)." *Id.* at ¶ 13. These factors

include:

(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

(b) The relative earning abilities of the parties;

(c) The ages and the physical, mental, and emotional conditions of the parties;

(d) The retirement benefits of the parties;

(e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

R.C. 3105.18(C)(1)(a)-(n).

{¶48} Though "a trial court does not need to list each of the R.C. 3105.18(C)(1) factors in its decision * * * [the] trial court must indicate the basis for its award in sufficient detail to enable a reviewing court to determine the trial court considered the factors and the award is fair, equitable and in accordance with the law." *Rigby v. Rigby*, 12th Dist. Brown No. CA2020-07-005, 2021-Ohio-271, ¶ 32, citing *Schuh v. Schuh*, 12th Dist. Butler No. CA2014-01-007, 2014-Ohio-4755, ¶ 12 and *Kaechele v. Kaechele*, 35 Ohio St.3d 93 (1988), paragraph two of the syllabus. In reaching its determination on spousal support, the court must not rely on any one factor taken in isolation. *Kaechele* at paragraph one of the syllabus.

{¶49} The record in the present case demonstrates the trial court reviewed all relevant R.C. 3105.18(C)(1) factors in determining the amount and duration of the spousal support award. The trial court specifically noted that the "factors of particular significance" in its decision to award spousal support were "the age of the parties; their marriage of nearly twelve years; the disparity of income; the property division here; the tax consequences for [Father] and [Mother]; the disparity in earning potential of the parties; [and] the parties' good standard of living during the marriage." Father ultimately disagrees with the weight the trial court afforded the applicable factors and the conclusions it drew from the evidence. However, disagreement alone is insufficient to demonstrate that the trial court abused its discretion. *See Spillane*, 2020-Ohio-5052 at ¶ 32. Competent and credible evidence supported the trial court's decision to order Father to pay Mother $720 a month, plus an additional 30 percent of his gross bonus pay for a period of 42 months as spousal support.

{¶50} Father contends the record demonstrates that Mother was voluntarily underemployed and intentionally not working to her earning potential as a means of financially benefiting in the divorce. "The earning ability of a party involves 'both the amount of money one is capable of earning by his or her qualifications, as well as his or her ability

to obtain employment.'" *Id.* at ¶ 16, quoting *Schenck v. Schenck*, 12th Dist. Butler No. CA2012-08-150, 2013-Ohio-991, ¶ 17. "When considering the relative earning abilities of the parties in connection with an award of spousal support, courts need not restrict their inquiry to the amount of money actually earned, but may also hold a person accountable for the amount of money the person could have earned if she or he had made the effort." *Id.* Therefore, in fashioning a spousal support award, a trial court "may impute income to a party who is voluntarily unemployed, voluntarily underemployed, or otherwise not working up to his or her potential." *Moore v. Moore*, 12th Dist. Clermont No. CA2006-09-066, 2007-Ohio-4355, ¶ 66.

{¶51} A court, of course, "may compare the parties earning abilities without imputing any income." *Spillane* at ¶ 17, citing *Collins v. Collins*, 9th Dist. Wayne No. 10CA0004, 2011-Ohio-2087." "Clearly if one spouse has substantial earning ability and the other does not, then this disparity will be a factor to be considered along with the other statutory factors when arriving at reasonable spousal support." *Collins* at ¶ 19. "As with other spousal support determinations, findings of whether a party is voluntarily underemployed, and the amount of income that should be imputed, if any, are factual determinations to be made by the trial court based on the circumstances of each particular case." *Spillane* at ¶ 18, citing *Schenck* at ¶ 17 and *Rock*, 67 Ohio St.3d at 112.

{¶52} The trial court heard testimony that Mother worked full time as a "diploma nurse" at Children's Hospital, working three 12-hour shifts per week and some overtime hours. Mother explained that while she had been in pursuit of her BSN, and would like to eventually complete the collegiate courses necessary to obtain her BSN, she took a break from her studies because the schoolwork was too taxing and difficult to accomplish with her other obligations to work and family. Mother does not believe earning her BSN will significantly increase her opportunities at work, unless she transitions into an administrative

or management position – a position she does not desire as she prefers to provide direct patient care. Mother denied that she intentionally sought to reduce her income by working less hours at the hospital or by stopping her pursuit of a BSN. Mother testified the number of hours, including overtime hours, she was able to work had been impacted by the Covid-19 pandemic, as the hospital had mandatory call-offs at times.

{¶53} Father, on the other hand, testified that Mother was voluntarily underemployed and had the potential to earn additional income by obtaining her BSN and by working additional hours, including overtime hours, at the hospital. Father claimed that Mother intentionally reduced her income by clocking out at the hospital right on time rather than working extra hours. He testified Mother had made comments to him after he filed for divorce about "about not wanting to work for our collective best" and sent him a text in October 2019 wherein she stated, "I'm not working more so you can have half."

{¶54} "It is well established that weighing conflicting evidence and credibility determinations are matters entrusted to the trial court, which was in the best position to evaluate the evidence and assess the credibility of the parties in light of such nuances as their body language and demeanor." *Id.* at ¶ 23, citing *Blevins v. Blevins*, 2d Dist. Green No. 2018-CA-23, 2019-Ohio-297. Having thoroughly reviewed the record, we find no abuse of discretion in the trial court's refusal to impute additional income to Wife where there was credible evidence supporting the court's determination that Wife was not voluntarily underemployed.

{¶55} We further find, contrary to Father's arguments, that the trial court did not err in finding a disparity in income and earning ability between the parties. Father contends the court failed to consider the "extra benefits" Children's Hospital provided to Mother when determining her income. However, the record reflects that in addition to the parties' testimony regarding Mother's salary, the court also considered Mother's paystubs, her W-

2s, her recent employee evaluations, and a "Total Rewards" information sheet, which set forth a dollar amount value for all of the perks associated with Mother's employment at Children's Hospital. Such perks included "contributions Cincinnati Children's [made] to [Mother's] retirement and health and dental insurance plans, Health Savings Account, MyHealthPath Wellbeing Incentives, as well as the value of benefits such as PTO and both Short/Long-term Disability Insurance." Even considering these perks, Father made noticeably more income than Mother. Additionally, as the trial court noted, the relative earning capacity of the parties was vastly unequal due to Father's significant bonus pay.

{¶56} Over the past few years, Father has earned significant bonuses from GE, earning $8,332.98 in 2018, $22,782.10 in 2019, and $32,436.79 in 2020. Father contends the trial court included the three-year average of his bonuses along with his base income of $133,569 to calculate his income for spousal support purposes as $146,112.96 and then proceeded to award Mother 30 percent of his annual bonus as spousal support, thereby "double counting" his bonuses. We find no merit to Father's argument. Although the trial court included the three-year average of Father's bonuses in calculating his income for child support purposes, as is required by the child support worksheet, the court did not do so in calculating his income for spousal support purposes. The base amount of spousal support, the $720 a month Father was ordered to pay as spousal support, did not include the average of Father's bonuses. The trial court specifically rejected using the average of Father's bonuses in its spousal support order, stating that "[f]or purposes of spousal support, a calculation based upon average [of] past bonuses/incentives and salary pay would be too speculative." We find that the court's order that Father pay Mother 30 percent of his gross bonus pay in addition to the base amount of $720 a month for a period of 42 months was appropriate and reasonable. *See Ornelas v. Ornelas*, 12th Dist. Warren No. CA2011-08-094, 2012-Ohio-4106, ¶ 46 (finding a spousal support order that included "one-third of

husband's bonuses" in addition to a monthly base amount of spousal support was appropriate and reasonable where the husband had more earning ability than his wife).

{¶57} Accordingly, in light of the record and the trial court's proper consideration of the factors set forth in R.C. 3105.18(C)(1), we find that the trial court did not abuse its discretion in awarding Mother spousal support of $720 a month ($8,640 a year), plus an additional 30 percent of Father's gross bonus pay for a period of 42 months. Father's third assignment of error is overruled.

{¶58} Judgment affirmed.

M. POWELL, P.J., and S. POWELL, J., concur.