[Cite as *Price v. Price*, 2025-Ohio-2479.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


KATHLEEN S. PRICE,                          :

    Appellee,                          :          CASE NO. CA2024-11-127

    - vs -                          :          <u>OPINION AND<br>JUDGMENT ENTRY</u><br>7/14/2025

                              :

BRETT E. PRICE,                          :

    Appellant.                          :


CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. DR23070455


The Law Office of Juliette Gaffney Dame, LLC, and Juliette Gaffney Dame, for appellee.

Caparella-Kraemer & Associates, LLC, and Todd D. Williams, for appellant.


## **O P I N I O N**


**HENDRICKSON, P.J.**

{¶ 1}   Appellant, Brett E. Price ("Husband"), appeals from the final decree of divorce issued by the Butler County Court of Common Pleas, Domestic Relations Division, terminating his marriage to Kathleen S. Price ("Wife"), dividing their property,

and awarding him two years of spousal support. For the reasons discussed below, we affirm the trial court's decision.

## I. FACTS & PROCEDURAL HISTORY

{¶ 2}   Husband and Wife were married on May 26, 1984 in Plantation, Florida but they later moved to Warren County, Ohio. Three children were born issue of their marriage, all of whom are now adults.

{¶ 3}   When the parties' children were younger, Wife only worked part-time. However, as the parties' children aged, she went to work full-time. Wife is a licensed practical nurse. She is employed in the Memory Care Unit at Otterbein Senior Life Retirement Community. She works three 12-hour shifts per week and is paid hourly. Wife makes $32 per hour for the first eight hours of her shift and $37 per hour for the remainder of her shift. Her pay includes base pay, shift differential pay, overtime pay, a clothing allowance, holiday pay, and double holiday pay. In 2023, Wife's gross income was $75,005.

{¶ 4}   Husband has a high school diploma and, prior to 2009, worked full-time in various businesses and fields. He has experience in the plumbing and electrical trades, as well as experience with computer technology and the development of circuit boards. Husband completed several corporate computer and technical training classes throughout his early career. At one point, Husband was employed as a bench technician and held a variety of contract jobs. In 2008, Husband lost his employment. He has not been employed by others or earned an income since 2008.

{¶ 5}   In 2011, Husband began working on his own enterprise creating electromagnetic motors, primarily for use in motor vehicles. He created the company Genatco Ltd., which is founded on green energy technology principles. Husband has been seeking capital investment for his company. As of May 2024, his company did not

have any reported sales. Wife's income has, therefore, been used to cover the cost of the parties' marital expenses.

{¶ 6} In July 2016, Wife's mother, Marjorie Bowling, a resident of North Carolina, conveyed in fee simple her North Carolina home to her two daughters, Wife and Wife's sister, Janet Martin, subject to a life estate Bowling reserved (hereafter, "2016 life estate deed"). Nearly six years later, in June 2022, Bowling passed away. In April 2023, the North Carolina home was sold. Husband, who had a dower interest in the property due to his marriage to Wife, signed off on the sale of the North Carolina home. The proceeds of the home were split between Bowling's two daughters, with each receiving $172,256.26. The check issued to Wife, however, was made payable to both Wife and Husband.

{¶ 7} On July 12, 2023, after nearly 40 years of marriage, Wife filed a complaint for divorce, alleging the parties were incompatible and Husband had committed gross neglect of duty. Wife moved out of the marital residence but continued to pay the mortgage and other bills associated with the marital home. Husband filed an answer to the complaint on September 28, 2023.

{¶ 8} A final divorce hearing was held on May 30, 2024. At the time of the final hearing, the parties had reached an agreement and entered into stipulations regarding the sale of the marital home and the division of various marital assets and debts. However, outstanding issues remained regarding Husband's request for spousal support, the division of proceeds from the sale of the North Carolina home, and Wife's request for attorney fees. Husband and Wife both testified at the final hearing. Wife also presented testimony from the realtor trying to sell the parties' marital home, testimony from a Butler County family law attorney regarding reasonable billing rates for attorneys and paralegals in a divorce case, and testimony from the North Carolina probate attorney and the North

Carolina real estate attorney who were involved, respectively, in the probate of Bowling's estate and sale of the North Carolina property.

{¶ 9} The North Carolina probate attorney testified that he drafted Bowling's 2016 life estate deed and handled the probate of Bowling's estate upon her death in 2022. The beneficiaries of Bowling's probate estate were Wife and Wife's sister, Martin. Husband was not named on the 2016 life estate deed; rather, only Wife and Wife's sister were the grantees of the property. The probate attorney explained that under North Carolina law, Husband had a "potential marital interest" or dower interest in the property. He stated that the North Carolina property was "[Wife's] separate property since she acquired it by gift or request since this was a deed." However, the probate attorney explained, "because of the future or the potentiality of the spousal interest, title and insurance companies do require that – it's common practice to have the spouse sign off on the – what is subsequently being transferred."

{¶ 10} The North Carolina real estate attorney testified that she represented the buyers who purchased the North Carolina property from Wife and Wife's sister. She explained that when she conducted a title search for the property, only Wife and Wife's sister were identified as the owners of the property. The real estate attorney included Husband's name on the sale documents due to Husband's dower rights. She explained that Husband's dower interest "gave him a potential marital interest if something happened to [Wife] prior to this all [the sale of the property] being finished." However, Husband did not have a right to the North Carolina property. Rather, "[h]e only would have had an interest in the property – he would have had an election to take an interest in the property if [Wife] died prior to this all being terminated or us getting everything done. . . . Prior to the closing and disbursement." The real estate attorney testified that after the North Carolina property was sold, she issued separate checks to Martin and to Wife for

their share of the proceeds ($172,256.26). Due to an issue in the software system her law office uses, Husband's name appeared on the check issued to Wife.[1] However, the real estate attorney clarified that Husband was not entitled to any portion of that check as Bowling had "left the property to the two sisters only."

{¶ 11} Wife testified that the money from the sale of the North Carolina home was deposited into an account at Fifth Third Bank that was in her name only. The bank put a hold on the funds at Husband's insistence and the funds remained untouched in the account as of the time of the final hearing. Wife denied that any marital funds were used in the upkeep of the North Carolina home or were used to pay taxes on the North Carolina property. Rather, Wife testified that any money spent on the upkeep of the North Carolina home came from funds drawn from Wife's mother's bank account. The proceeds of this bank account were inherited by Wife and Wife's sister following Bowling's death.

---

1. During the final hearing, the North Carolina real estate attorney was presented with a copy of the check issued by her law firm to "Kathleen Susan Price and Brett Price" in the amount of $172,256.26. She was questioned about the check as follows:

> [Wife's Counsel]: What is that check for?
>
> [Real Estate Attorney]: That's half the proceeds from the sale of the [North Carolina] property.
>
> [Wife's Counsel]: Okay. And it's made out to both Kathleen and Brett Price, correct?
>
> [Real Estate Attorney]: Because he was on my seller docs in my software closing program, yes.
>
> [Wife's Counsel]: So is Mr. Price entitled to a portion of that check?
>
> [Real Estate Attorney]: No.
>
> [Wife's Counsel]: Why not?
>
> [Real Estate Attorney]: The mother left the property to the two sisters only.
>
> [Wife's Counsel]: Okay. Any other reason?
>
> [Real Estate Attorney]: No. The will was very clear, but he still had to sign some of the seller documents, which is why he's in my software program, and that's why his name popped up on the check.

{¶ 12} Neither Wife nor Husband, both 63 years old at the time of the final hearing, testified that they had any health issues that prevented them from working. Both discussed their work history, with Wife noting that Husband's leave from the workforce was only supposed to be temporary. When he lost his job in 2008, Wife testified she agreed with him becoming an entrepreneur, but that was supposed to be temporary. Wife indicated that Husband "would say he would stop in like six months and return to work." However, Husband never returned to work and he failed to find backing or investors for the business he started. Wife could not recall Husband seriously applying to "regular brick and mortar businesses."

{¶ 13} In August 2023, Husband submitted an application for an electronic engineering position at Cornerstone Research Group. In the application, Husband indicated he became aware of the corporation from the "Indeed slave labor jobs email," and he was critical of the job description and skills sought by the potential employer, informing the employer that the "full list of skills demands constitute[s] nothing less than slave labor!" Husband indicated on the application that he had a salary expectation of $275,000 to $350,000 for the advertised position and, when asked to provide three professional references, listed only himself as the "engineer, first inventor, CEO" of Genatco Ltd. On cross-examination, Husband admitted he has never earned the amount of salary he requested on the Cornerstone Research Group application.

{¶ 14} Husband claimed that he had applied for "many" jobs but was unable to find employment. He described various courses, on-the-job, and computer-based trainings and programs he completed in the 1980s through the early 2000s. When asked whether he currently lacked certifications in any field in which he held a degree or had received training, Husband responded, "None [were] required [with him] being a self-educated

genius of many trades." On cross-examination, when asked what type of job he was qualified to work, he quipped, "I suppose I could be a janitor."

{¶ 15} Husband testified that because he has not worked or earned a taxable income since 2008, Wife has paid the parties' bills. Wife paid the mortgage on the marital home, paid for the majority of the home's utilities and expenses, paid for his car insurance, and paid for his health insurance. Husband indicated that he recently got a $10,000 line of credit which he was using to cover some of his bills so that he did not have to completely rely on Wife. He indicated he used the line of credit to pay his attorney fees.

{¶ 16} Regarding the proceeds from the sale of the North Carolina property, Husband testified he believed he was entitled to one-half of the $172,256.26 Wife received. Husband believed he was entitled to this money because he signed paperwork allowing the sale of the property and because the check from the sale of the property was issued in both his and Wife's name.

{¶ 17} Following the final hearing, both Wife and Husband submitted written closing arguments in support of their respective positions. On July 19, 2024, the trial court issued a decision granting Wife a divorce on the grounds of gross neglect of duty. Wife was ordered to pay $400 per month to Husband as spousal support for two years (24 months). The trial court found that while Wife was "employed to her full capacity," when considering "Husband's skills, training, [and] work history . . . Husband is voluntarily unemployed." The court imputed full-time Ohio minimum wage income ($19,019) to Husband, finding that with his training, "he could be employed to that capacity or likely much more." The trial court determined that its award of spousal support was appropriate and reasonable given "the age of the parties; the lengthy forty-year marriage; the disparity of income; the property division herein; the tax consequences for both parties; [and] the little disparity in earning potential of the parties."

{¶ 18} With respect to the North Carolina property, the court found that Wife had provided substantial and convincing evidence that Wife had inherited a one-half interest in the property from her mother during the parties' marriage. The Court further found that Wife had demonstrated that the funds from the sale of the North Carolina property had been deposited into a Fifth Third Bank Account ending in 1036 and "tracing the separate interest was overwhelmingly documented by Wife." In rejecting Husband's claim that he had an interest in the funds, the court stated as follows:

> Husband's contention he held interest stems only from North Carolina's law of dower interest which required Husband to sign off on the sale of the real estate during estate administration. Dower is/was a means of providing the surviving spouse with a source of support when the other spouse dies. Not all states retain the concept of dower. Since Wife is alive, Husband's dower rights have not materialized into a vested property claim and he has provided no controlling authority to support his claims against Wife's clear separate interest of inheritance regardless of the manner in which the check was issued.

{¶ 19} Finally, with respect to the issue of attorney fees, the trial court found that "[e]ach party shall pay their own attorney fees." The trial court's decision was incorporated into a Final Decree of Divorce on October 11, 2024.

## II. HUSBAND'S APPEAL

{¶ 20} Husband timely appealed, raising two assignments of error for our review.

{¶ 21} Assignment of Error No. 1:

{¶ 22} THE TRIAL COURT ERRED BY FINDING THE PROCEEDS OF THE SALE OF THE NORTH CAROLINA HOME WERE [WIFE'S] SEPARATE PROPERTY.

{¶ 23} In his first assignment of error, Husband argues the trial court erred by classifying the proceeds from the sale of the North Carolina property as Wife's separate, nonmarital property. He argues that the North Carolina home inherited by Wife was

"treated . . . as joint marital property," as evidenced by the fact that he had to sign off on the sale of the North Carolina property and the proceeds check from the sale was addressed to both him and Wife. Husband cites the Ohio Uniform Commercial Code, R.C. 1303.08(A), in support of his argument that the proceeds equally belong to him.[2]

{¶ 24} In dividing property in a divorce proceeding, a domestic relations court must first determine "what constitutes marital property and what constitutes separate property." R.C. 3105.171(B). *Smith v. Smith*, 2023-Ohio-982, ¶ 28 (12th Dist.). Marital property includes "[a]ll real and personal property that currently is owned by either or both of the spouses . . . and that was acquired by either or both of the spouses during the marriage." R.C. 3105.171(A)(3)(a)(i). "'Marital property' does not include any separate property." R.C. 1305.171(A)(3)(b). Separate property includes real or personal property that is "[a]n inheritance by one spouse by bequest, devise, or descent during the course of the marriage." R.C. 1305.171(A)(6)(a)(i). An appellate court "review[s] the classification of property . . . as marital or separate under the manifest-weight-of-the-evidence standard and will not reverse a domestic court's classification if it is supported by competent and credible evidence." *Smith* at ¶ 28. *See also Kochaliyev v. Kochaliyeva*, 2025-Ohio-1140, ¶ 24 (12th Dist.).

---

2. R.C. 1303.08(A), which relates to commercial paper or instruments, provides as follows:

> The person to whom an instrument is initially payable is determined by the intent of the person, whether or not authorized to sign the instrument, who signs the instrument as, in the name of, or in behalf of the issuer of the instrument. The instrument is payable to the person intended by the signer even if that person is identified in the instrument by a name or other identification that is not that of the intended person. If more than one person signs in the name or behalf of the issuer of an instrument and all the signers do not intend the same person as payee, the instrument is payable to any person intended by one or more of the signers.

{¶ 25} In the present case, the manifest weight of the evidence established that the proceeds from the sale of the North Carolina home were Wife's separate property. Wife and Wife's sister each received a one-half interest in the home by way of inheritance from their mother. Only Wife's and Wife's sister's names appeared on the property's deed, which was admitted into evidence. The probate attorney who drafted the deed and handled Bowling's affairs testified that the property had been conveyed only to Wife and Wife's sister, with Bowling reserving a life estate. Following Bowling's death, the upkeep of the property and the property's taxes were paid with nonmarital assets, namely with assets from Bowling's estate, until the property was sold.

{¶ 26} Both the North Carolina probate attorney and the North Carolina real estate attorney testified that Husband was involved in the paperwork for the sale of the property merely because he held a dower interest, which was relevant only if Wife died prior to the sale of the property being finalized.[3] However, as Wife had not died prior to the sale being finalized, Husband had no interest in the property. He likewise had no interest in the proceeds that resulted from the sale of the property. The fact that a software issue led to Husband's name inadvertently being placed alongside Wife's name on the proceeds check did not convert the funds from Wife's separate property into marital property. Husband's reliance on the Uniform Commercial Code, R.C. 1303.08(A), is misplaced. The statute has no bearing on whether property is classified as marital property or separate property for purposes of domestic relations matters. The actions of the real estate attorney in addressing the proceeds check to Wife *and* Husband could not convert Wife's separate

---

3. Common law dower has been abolished in North Carolina, but North Carolina General Statute §29-30 "preserves to a surviving spouse the benefits of the former rights of dower and curtesy." *Smith v. Smith*, 265 N.C. 18, 30 (1965).

property into marital property. Wife continued to hold the funds out as her own separate property, depositing the funds into a Fifth Third Bank account that was in her name only.

{¶ 27} Accordingly, we find that competent and credible evidence supported the trial court's determination that the proceeds from the sale of the North Carolina home were Wife's separate property. Husband's arguments are without merit and his first assignment of error is overruled.

{¶ 28} Assignment of Error No. 2:

{¶ 29} THE TRIAL COURT ERRED BY ONLY AWARDING [HUSBAND] $400 PER MONTH IN SPOUSAL SUPPORT FOR A PERIOD OF TWO YEARS.

{¶ 30} In his second assignment of error, Husband argues that the trial court erred in only awarding him $400 in spousal support for two years. Husband argues that such an award is "woefully small and not appropriate or reasonable" given the duration of the marriage, the difference in income between the parties, and the fact that he has not earned an income in nearly 16 years. Husband does not challenge the trial court's finding that he is voluntarily unemployed or the court's decision to impute full-time minimum wage income to him. Rather, Husband maintains that even with his imputed income of $19,019, there remains a significant disparity between his and Wife's income, and he argues that he should have been awarded "at least $1,400 per month for an indefinite period" in order to ensure he enjoys the same standard of living he had during the parties' marriage.

{¶ 31} "A trial court has broad discretion in determining whether to award spousal support, as well as the amount and duration of such award, based on the facts and circumstances of each case." *Spillane v. Spillane*, 2020-Ohio-5052, ¶ 12 (12th Dist.); *MacKnight v. MacKnight*, 2022-Ohio-648, ¶ 46 (12th Dist.). "Absent an abuse of discretion, a spousal support award will not be disturbed on appeal." *Thompson v. Thompson*, 2023-Ohio-667, ¶ 40 (12th Dist.). An abuse of discretion "implies that the

court's attitude is unreasonable, arbitrary, or unconscionable." *Maloney v. Maloney*, 2016-Ohio-7837, ¶ 14 (12th Dist.). "A decision is 'unreasonable' when there is no sound reasoning process to support it." *Vaughn v. Vaughn*, 2007-Ohio-6569, ¶ 12 (12th Dist.). "'An arbitrary decision is one that lacks adequate determining principle and is not governed by any fixed rules or standard.'" *Dickenson v. Jackson*, 2024-Ohio-1236, ¶ 19 (12th Dist.), quoting *Crawford v. Fisher*, 2015-Ohio-114, ¶ 5 (10th Dist.). "An unconscionable decision may be defined as one that affronts the sense of justice, decency, or reasonableness." *Schaible v. Schaible*, 2025-Ohio-1404, ¶ 9 (12th Dist.).

{¶ 32} "A trial court has a statutory duty to base a spousal support order on a careful and full balancing of the factors in R.C. 3105.18(C)(1)." *Spillane* at ¶ 13. These factors include:

> (a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
>
> (b) The relative earning abilities of the parties;
>
> (c) The ages and the physical, mental, and emotional conditions of the parties;
>
> (d) The retirement benefits of the parties;
>
> (e) The duration of the marriage;
>
> (f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
>
> (g) The standard of living of the parties established during the marriage;
>
> (h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

R.C. 3105.18(C)(1)(a)-(n).

{¶ 33} "[A] trial court does not need to list each of the R.C. 3105.18(C)(1) factors in its decision." *Rigby v. Rigby*, 2021-Ohio-271, ¶ 32 (12th Dist.), citing *Schuh v. Schuh*, 2014-Ohio-4755, ¶ 12 (12th Dist.). However, the trial court must "indicate the basis for its award in sufficient detail to enable a reviewing court to determine the trial court considered the factors and that the award is fair, equitable and in accordance with the law." *Rigby* at ¶ 32, citing *Kaechele v. Kaechele*, 35 Ohio St.3d 93 (1988), paragraph two of the syllabus; *MacKnight* at ¶ 48. "In reaching its determination on spousal support, the court must not rely on any one factor taken in isolation." *Id.*, citing *Kaechele* at paragraph one of the syllabus.

{¶ 34} The record in the present case demonstrates the trial court reviewed all relevant R.C. 3105.18(C)(1) factors in determining the amount and duration of the spousal

support award. The trial court specifically noted that the "factors of particular significance" in its decision to award Husband spousal support were the "age of the parties; the lengthy forty year marriage; the disparity of income; the property division herein; the tax consequences for both parties; [and] the little disparity in earning potential of the parties." Husband ultimately disagrees with the weight the trial court afforded the applicable factors and the conclusions it drew from the evidence. However, "disagreement alone is insufficient to demonstrate the trial court abused its discretion." *MacKnight* at ¶ 49, citing *Spillane*, 2020-Ohio-5052 at ¶ 32. There was competent and credible evidence that supported the trial court's decision to order Wife to pay Husband $400 a month in spousal support for two years.

{¶ 35} Though Husband has not earned an income since 2008, the record reveals that he is voluntarily unemployed. Husband is physically capable of working and has held a variety of positions over the years, working in the plumbing and electrical trades, as a bench technician, and with computers. Husband has his high school diploma and has completed several corporate computer and technical training courses. Though Husband claimed he had applied for "many jobs," the court found that appellant's "pursuit of employment . . . was less than serious" and noted his "flippant, disagreeable, [and] condescending conduct" as evidenced by his application with Cornerstone Research Group. Given Husband's skills, training, and work history, the court found that he could be employed full time at minimum wage or "likely much more." "When considering the relative earning abilities of the parties in connection with an award of spousal support, courts need not restrict their inquiry to the amount of money actually earned, but may also hold a person accountable for the amount of money the person could have earned if she or he had made the effort." *Spillane* at ¶ 16. The trial court was entitled to find that there was "little disparity in earning potential" between Husband and Wife.

{¶ 36} Husband argues that the amount of spousal support awarded was insufficient to ensure him the "same standard of living as he [had] during the marriage." However, "the Ohio Supreme Court has specifically rejected the idea that each party is entitled to achieve a standard of living comparable to that enjoyed during the marriage." *Justice v. Justice*, 2007-Ohio-5186, ¶ 20 (12th Dist.), citing *Kaechele*, 35 Ohio St.3d at 95. "Obviously, neither party will enjoy exactly the same standard of living now that there are two households to maintain. Neither party is guaranteed the same standard of living enjoyed during the marriage." *Dunham v. Dunham*, 2007-Ohio-1167, ¶ 76 (10th Dist.). "[T]he trial court is not required to apply an equal standard of living to the parties; all that the trial court is required to do is consider all of the factors in R.C. 3105.18(C)(1) and fashion an award that is appropriate and reasonable." *Salpietro v. Salpietro*, 2023-Ohio-169, ¶ 39 (6th Dist.). We find that the trial court considered all the relevant factors in R.C. 3105.18(C)(1) in fashioning its spousal support award, including the age of the parties and their physical conditions, their respective educations, the length of their marriage, their standard of living, their respective income and earning abilities, their retirement benefits, and their division of property. When all of these factors are considered together, there is no evidence that the trial court acted unreasonably, arbitrarily, or unconscionably in setting the amount or duration of spousal support. We therefore find that the trial court did not err in ordering Wife to pay Husband $400 a month in spousal support for a period of two years. Husband's second assignment of error is overruled.

### III. WIFE'S REQUEST FOR ATTORNEY FEES

{¶ 37} In her appellate brief, Wife has asked that we award her "reasonable attorney fees under Loc.R. 25(A) based on [Husband's] filing of a frivolous appeal." Wife has not, however, filed a motion for attorney fees pursuant to Loc.R. 25(A) or App.R. 15(A). The former provides, in pertinent part, that the court may award sanctions,

including reasonable expenses and attorney fees, "[i]f the court . . . *upon the motion of a party*, determines that an appeal . . . is frivolous or prosecuted for the purpose of delay, harassment, or other improper purpose." (Emphasis added.) Loc.R. 25(A). The latter provides that "[u]nless another form is prescribed by these rules, an application for an order or other relief *shall be made by motion* with proof of service on all other parties." (Emphasis added.) App.R. 15(A). Merely including "[a] paragraph in a responsive brief is insufficient to raise the issue [of attorney fees and frivolous conduct] before this court." *Richards v. Beechmont Volvo*, 127 Ohio App.3d 188, 192 (1st Dist. 1998). Rather, a separate motion is necessary. *Wohlabaugh v. Salem Communications Corp.*, 2005-Ohio-1189, ¶ 18 (8th Dist.); *Carrollton Exempted Village School Dist. Bd. of Edn. v. Ohio Assn. of Pub. School Employees and Its Local #541*, 2004-Ohio-1385, ¶ 28 (7th Dist.). Accordingly, as Wife failed to file a separate motion, we will not consider Wife's request for Loc.R. 25(A) sanctions. *See id*.; *Wohlabaugh* at ¶ 18; *Tedrick v. Tedrick*, 2016-Ohio-1488, ¶ 36 (12th Dist.).

## IV. CONCLUSION

{¶ 38} Having found no merit to Husband's assignments of error, the judgment of the trial court is hereby affirmed.

M. POWELL and BYRNE, JJ., concur.

- 17 -

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas, Domestic Relations Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed to appellant.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Mike Powell, Judge

/s/ Matthew R. Byrne, Judge