[Cite as *Thompson v. Thompson*, 2023-Ohio-667.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

| | | |
|---|---|---|
| VANESSA J. THOMPSON, | : | |
| Appellee, | : | CASE NO. CA2022-05-014 |
| | : | O P I N I O N<br>3/6/2023 |
| - vs - | : | |
| | : | |
| MICHAEL P. THOMPSON, | : | |
| Appellant. | : | |

APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. DRA 19000316

Rose & Dobyns Co., LPA, and Scott B. Evans, for appellee.

Smith, Meier & Webb, LPA, and Andrew P. Meier, for appellant.

**M. POWELL, J.**

{¶ 1} Appellant, Michael Thompson ("Father"), appeals a decision of the Clinton County Court of Common Pleas designating appellee, Vanessa Thompson ("Mother"), residential parent and legal custodian of the parties' children, awarding spousal support to Mother, and finding Father in contempt of court for interfering with Mother's parenting time.

{¶ 2} The parties were married on September 25, 2007. Two sons, Leo and Max, and a daughter, Nina, were born issue of the marriage.[1] On September 18, 2019, Mother filed a complaint for divorce. Leo was almost 12 years old; Max was almost 11 years old; Nina was almost five years old.

{¶ 3} On September 24, 2019, a temporary order was filed, designating Mother as the children's residential parent, providing Father with parenting time, and ordering Father to pay temporary child support of $1,571.01 per month. At the time, the parties were still residing together. On October 8, 2019, a modified temporary order was journalized, designating both parties as residential parent for the children, suspending Father's child support obligation, ordering Father to pay all household expenses and the payment for the Hummer (the vehicle driven by Mother), and ordering both parties to contribute $200 a month for child expenses. A guardian ad litem ("GAL") was subsequently appointed for the children.

{¶ 4} Mother moved for exclusive use of the marital home after Father vacated the home to reside with his girlfriend. The trial court granted the motion on December 5, 2019. On December 18, 2019, Father's temporary parenting time with the children was modified to provide him parenting time on Tuesdays and Thursdays after school until 8:00 p.m. and every other weekend from Friday after school until Sunday at 6:00 p.m. On November 3, 2020, a hearing was held before a magistrate during which spousal support and the allocation of parental rights and responsibilities were disputed. Both parties sought custody of the children.

{¶ 5} In December 2020, an altercation occurred between Mother and Leo over Leo's use of his cellphone late at night. Leo told Mother he did not have to get off his phone

---

1. For privacy and readability purposes, we refer to the children using fictitious names.

because she did not pay for the phone. Leo was struck in the neck as the two were struggling over the phone. A couple days later, on December 16, 2020, Leo came home from school complaining he could not breathe. Mother took him to an urgent care facility and advised Father who went to the urgent care facility. Apparently, Leo was experiencing a panic attack. Leo went home with Father from urgent care; the next day (a Thursday), Father picked up Max and Nina for his scheduled parenting time. On December 19, 2020, during Father's parenting time, Leo was holding his stomach and complained his "head would not stop." Father took Leo to Children's Hospital. The hospital's visit summary listed anxiety, gastroesophageal reflux disease ("GERD"), and constipation as diagnoses as well as "suspected physical abuse." The visit summary made no mention of injury or the allegations of physical abuse and did not include a substantiation of physical abuse. Father did not return the children to Mother at the conclusion of his parenting time on Sunday December 20, 2020.

{¶ 6} On December 23, 2020, Father moved to suspend Mother's parenting time with the children "until a hearing can be held in this matter." Father kept the children through the Christmas holidays; Mother did not see the children again until mid-January 2021. Mother moved to have Father held in contempt for denying her parenting time. Father moved for an in-camera interview of the children on the ground they were abused in Mother's home. On January 13, 2021, the magistrate appointed Dr. William Kennedy to conduct a custody evaluation.

{¶ 7} On June 22, 2021, a hearing was held before the magistrate. Father, Mother, and Dr. Kennedy testified; the GAL did not testify. In her July 2020 report, the GAL recommended that Mother be designated the children's residential parent and legal custodian. Dr. Kennedy recommended that Father be designated the children's residential parent and legal custodian if Mother did not seek and receive significant mental health

- 3 -

treatment to address her parenting issues and relationship with the children. In the event those recommendations were followed, Dr. Kennedy recommended that the parties have equal parenting time; in the event they were not, Dr. Kennedy recommended that Father be designated the children's residential parent and legal custodian. On June 24, 2021, the parties agreed to modify the temporary order pending a decision from the magistrate. Specifically, Father was ordered to pay Mother $1,000 a month beginning December 1, 2020, with credit for payments made by him after December 1, 2020, for real estate taxes, mortgage, Hummer payments, and other household expenses.

{¶ 8} On October 20, 2021, the magistrate's decision was journalized. The magistrate designated Mother as the children's residential parent and legal custodian, ordered Father to pay $1,056.71 a month in child support effective January 1, 2021, ordered Father to pay $600 a month in spousal support for 48 months, beginning November 1, 2021, and found Father in contempt for denying Mother parenting time between mid-December 2020 and mid-January 2021. The magistrate did not credit Father for the payments he made between September 24, 2019, and the October 20, 2021 magistrate's decision. Father filed objections to the magistrate's decision. On May 16, 2022, the trial court overruled Father's objections, adopted the magistrate's decision, and journalized a decree of divorce consistent with the magistrate's decision.

{¶ 9} Father now appeals, raising three assignments of error.

{¶ 10} Assignment of Error No. 1:

{¶ 11} THE TRIAL COURT ERRED IN ALLOCATING PARENTAL RIGHTS AND RESPONSIBILITIES FOR THE PARTIES' MINOR CHILDREN.

{¶ 12} Father argues that the trial court abused its discretion by designating Mother as the children's residential parent and legal custodian. Father asserts the trial court ignored Dr. Kennedy's recommendation that Father be designated the children's residential

parent and legal custodian, Dr. Kennedy's description of Mother's relationship with the children as "toxic," and Dr. Kennedy's concerns about Mother's mental health.

{¶ 13} R.C. 3109.04 governs a trial court's allocation of parental rights and responsibilities. Of paramount concern in any custody determination is the best interest of the child. *Vaughn v. Vaughn*, 12th Dist. Warren No. CA2021-08-078, 2022-Ohio-1805, ¶ 42. To determine what is in the best interest of a child, R.C. 3109.04(F)(1) requires the trial court to consider all relevant factors. *Ackley v. Haney*, 12th Dist. Fayette No. CA2021-07-017, 2022-Ohio-2382, ¶ 15. These factors include, but are not limited to: (1) the wishes of the parents; (2) the child's interaction and interrelationship with the child's parents, siblings, and other persons who may significantly affect the child's best interest; (3) the child's adjustment to home, school, and community; (4) the mental and physical health of all persons involved; (5) the parent more likely to honor and facilitate court-approved parenting time rights; (6) whether either parent has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; and (7) whether the residential parent has continuously and willfully denied the other parent's court-ordered parenting time. No single factor is determinative of the best interest of a child; rather, the determination should be made in light of the totality of the circumstances. *Vaughn* at ¶ 42.

{¶ 14} A trial court has broad discretion in allocating parental rights and responsibilities and its decision will not be reversed absent an abuse of discretion. *Seng v. Seng*, 12th Dist. Clermont No. CA2007-12-120, 2008-Ohio-6758, ¶ 16. "The discretion a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination has on the lives of the parties concerned." *Grover v. Dourson*, 12th Dist. Preble No. CA2018-07-007, 2019-Ohio-2495, ¶ 15. So long as there is competent and credible evidence in the record to support

the custody determination, the trial court's decision will stand because the court has had the best opportunity "to view the demeanor, attitude, and credibility of each witness," which may not easily translate to the written record. *Seng* at ¶ 16; *Davis v. Flickinger*, 77 Ohio St.3d 415, 418.

{¶ 15} In designating Mother the residential parent and legal custodian of the children, the trial court considered and discussed each of the relevant R.C. 3109.04(F)(1) best-interest factors in light of the evidence presented at both hearings. Throughout its discussion, the trial court referred to the GAL's July 2020 report, Dr. Kennedy's March 2021 custody evaluation, and Dr. Kennedy's testimony.[2]

{¶ 16} The GAL's investigation included meeting with the children, Mother, Father, and some of the children's teachers. In her report, the GAL noted that there was a strong bond between Mother and the children, that Father wanted "full custody with 50/50 on visits," that both parents loved their children, and that the parents did not get along.

{¶ 17} The report stated that the children all liked the parenting schedule then in place when the GAL first interviewed the children. Subsequently, Father contacted the GAL and informed her that the children wanted to talk to her again because they were upset with what they had initially told her. The GAL then interviewed each child individually. Leo and Max told the GAL they were talking to her again because Father wanted them to. The boys stated that Father had explained that the current parenting schedule was neither equal nor right and that they were only "visiting" him. One of the boys told the GAL that she had not explained custody to him but that Father had. Max told the GAL he changed his mind after talking to his brother and Father. In her report, the GAL expressed concern that a child told her she had not explained custody, a legal term, to him, and that the "children thought

2. We note that at the time of oral arguments, neither the GAL's report nor Dr. Kennedy's evaluation had been included in the record provided on appeal. They were, however, received thereafter.

seeing their dad on Tuesdays, Thursdays and every other weekend was equal, until dad explained custody." Based on the foregoing, the GAL recommended that Mother be designated residential parent and legal custodian of the children.

{¶ 18} In his March 2021 report and during the June 2021 hearing, Dr. Kennedy described specific concerns he had regarding Mother's relationship with the children and the contentious relationship between Mother and Father.

{¶ 19} The report described Father's relationship with the children as positive, supportive, nurturing, and rewarding. Dr. Kennedy found no evidence of parental alienation by either parent and noted that while the relationship between Mother and Leo was damaged and problematic, it was likely Father did little to help it and may do things that undermine the relationship. The report described Mother's relationship with the children as fluctuating drastically between extremely positive, caring, supportive, and compassionate to hostile, disrespectful, toxic, and tumultuous. In particular, exchanges between Mother and Leo involved mutual name-calling. Nonetheless, the report indicated that the exchanges between Mother and the children were overall more often positive, non-conflictual, caring, and nurturing than hostile. Apparently, the December 2020 altercation between Mother and Leo was recorded and Dr. Kennedy was able to listen to a portion of the exchange. He noted there was a bi-directional escalation of the hostilities, with Mother yelling and Leo mocking, yelling, and taunting. Mother acknowledged that her name-calling during a heated exchange with Leo was wrong and that she was not proud of her behavior.

{¶ 20} Mother's test scores indicate that she is extremely stress intolerant and stress reactive, worry prone, and insecure. Mother is an emotionally responsive person and likely to be suspicious and less trusting. The child custody litigation increased her level of distrust and feeling of persecution. Dr. Kennedy explained that children will try to pull a parent off balance because they can obtain what they want in doing so. Dr. Kennedy testified that

Mother needs to regulate her emotions before reacting to prevent further escalation, needs to have consequences in place and understand that physical aggression only worsens matters, and needs both individual therapy and family counseling to learn how to control her reactiveness, anger, and anxiety. Dr. Kennedy stated that Mother likely needed 12 to 16 sessions of individual therapy; however, if Mother sought treatment and had a couple of sessions, this was sufficient to mitigate his concerns regarding her reactive behaviors.

{¶ 21} Father's test scores show that he presents himself both in an extremely positive light, without many minor faults and shortcomings most people acknowledge, and as a remarkably well-adjusted individual. Dr. Kennedy noted that Father may be unwilling to self-examine his role in difficult situations of prolonged distress, that is, that he is less likely to be introspective and look into whether he may have facilitated or caused a situation, inadvertently or directly. Dr. Kennedy noted Father's hostile bias toward Mother, explaining that Father sees Mother's behavior and conduct as either positive or negative. If there is any gray area, Father assumes that Mother is acting intentionally and maliciously for negative reasons. Consequently, because Father is so convinced that Mother routinely engages and has engaged in abusing the children, regardless of previous unsubstantiated allegations, he is unable to consider any possible alternate explanations and is unlikely to consider the veracity or motives behind any negative comments made by the children about Mother. Dr. Kennedy opined that Father's hostile bias "significantly impairs [the parties'] ability to work in unison for the betterment of the children." Dr. Kennedy testified he did not see any reportable issues involving abuse. Furthermore, in March 2021, a Children's Services representative informed Dr. Kennedy that multiple investigations had been opened in the past, that all were closed as being unfounded, and that there were no pending, open investigations.

{¶ 22} Dr. Kennedy noted that when asked, Father was unable to list any positive

parenting traits or any past positive behaviors of Mother. Furthermore, when asked whether Mother loves the children, Father took a long time before answering, "I don't see how she could," and when pressed further on the matter, eventually stated, "I guess so, in her own way." By contrast, Mother spontaneously and immediately listed several positive characteristics and traits of Father and stated that Father genuinely loves and cares for all three children. Dr. Kennedy described the parents' communication as highly conflictual and made worse by texting as both parties tended to misinterpret the tone of the other's text messages.

{¶ 23} Dr. Kennedy testified that both Max and Nina have some anxiety, that Leo has an anxiety disorder that needs to be treated behaviorally and cognitively, and that the family needs to engage in family counseling to learn how to interact with one another in a positive manner. All three children clearly indicated that they wanted to see and stay with both parents; the boys' biggest concern with parenting time was not the amount of time but rather, that the schedule was too fractured, requiring an "exhausting going back and forth all the time." The bond between the children was strong and positive; the children's bond with each parent was likewise strong and positive.

{¶ 24} Based upon the foregoing, Dr. Kennedy recommended that Mother receive both mental health treatment and family counseling, and that treatment should be continued until the treatment provider and Mother mutually agreed the treatment goals had been met. In the event those recommendations were followed, Dr. Kennedy recommended that the parties have equal parenting time; in the event they were not, Dr. Kennedy recommended that Father be designated the children's residential parent and legal custodian.

{¶ 25} Testimony at the November 3, 2020 hearing revealed that the children struggled with virtual schooling during the COVID-19 pandemic but that they were doing better, and that Leo and Nina both suffered physical injuries in Mother's care while playing

with other children (a broken arm for Nina, a chipped tooth and leg injury for Leo). Father denied coaching the children to ask the GAL for equal parenting time and denied explaining what custody and equal parenting time mean, stating "there was no sit down explanation of any kind of legal term." Father lamented he had become "a visiting father" under the parenting time schedule in place since December 18, 2019. Father acknowledged Mother's flexibility with his parenting time and occasionally allowing him to "gap" his visitation weekend to a midweek visitation overnight. He further testified she has never deprived him of his parenting time.

{¶ 26} During that same hearing, Mother testified she had been investigated by Children's Services twice in the past six months. The earlier investigation involved an allegation of physical abuse regarding one of the children; the latter investigation involved an allegation that Nina had observed sexual conduct between Mother and her boyfriend. Mother testified that Nina talked to a child care advocate during the second investigation and to the GAL during the first investigation, and stated, "It takes a toll on a child." Mother denied engaging in any sexual activity in Nina's vicinity or presence or abusing the children. She testified that she had no convictions for domestic violence, abuse of a child, or child endangering, and that the children have never been removed from her care or custody. At the time of the hearing, Father was living with his girlfriend, their newborn son, and her two children. Father denied calling Children's Services regarding the broken arm and chipped tooth incidents and stated someone else called the agency about the arm injury.

{¶ 27} During the June 2021 hearing, Father testified he wanted full custody of the children with standard parenting time for Mother due to concerns about her mental health and need to seek treatment to address her anger, her poor communication, and coparenting. Father stated that following the December 19, 2020 visit to Children's Hospital, a social worker reported the "suspected physical abuse" to Children's Services, triggering

an investigation. The suspected physical abuse was ultimately found to be unsubstantiated. Father admitted contacting Children's Services approximately ten times in the past nine months. As a result, Leo had spoken to the agency approximately five times, and Max and Nina a couple of times. Father admitted that the abuse allegations were never substantiated. Father acknowledged that he withheld the children from Mother from mid-December 2020 to mid-January 2021, including on Christmas Day. Father testified, however, that his interference with Mother's parenting time was absolutely appropriate and that he would absolutely do it again.

{¶ 28} Mother testified she wanted full custody of the children but would be agreeable to shared parenting if such was the children's desire. Upon reading Dr. Kennedy's report, she contacted Solutions to receive an assessment for herself and arranged for family counseling. No treatment was recommended for Max or Nina; however, Leo was diagnosed with an anxiety disorder. The parties' testimony indicates that Leo is doing better now that he takes medication and is in counseling for his anxiety. Mother was evaluated at Solutions and referred to a counselor. Mother was diagnosed with divorce-related stress, engaged in two counseling sessions, and was provided with palliative tools when confronted with a stressful situation, such as counting to four and walking away. The counselor advised Mother to continue with counseling sessions as needed; Mother stated she would meet with the counselor approximately once a month.

{¶ 29} Mother testified she was never charged with a crime and Children's Services did not file an emergency action following her December 2020 altercation with Leo. Mother stated that the family has been doing a lot better in communicating in the last couple of months, that she is better at coparenting with Father, and that she is trying to get better for the children. Mother testified she has apologized to Leo for her name-calling, agreed name-calling escalates situations, and stated she would do things differently. Mother testified that

she and the boys have verbal disagreements every couple of months, "but not where it's bad," and that there have been no disagreements lately.

{¶ 30} In reaching its custody determination, the trial court noted the parties' high-conflict communication detrimental to the well-being of their children; Father's hostile bias toward Mother; Mother seeking treatment for her anxiety and divorce-related stress and her recognition that past reactive behaviors were wrong; the improvement in her relationship with Leo following counseling; Father's denial of Mother's parenting time for approximately four weeks, his belief the withholding was appropriate, and his assertion he would do it again; and the fact that any allegation of suspected child abuse was never substantiated.

{¶ 31} While testimony at the hearings revealed that Mother has a history of reacting harshly resulting in verbal and aggressive altercations with the children, the testimony also shows that Mother took Dr. Kennedy's report seriously and sought counseling to address her emotional responses. Dr. Kennedy stated that if Mother sought treatment and had a couple of sessions, this was sufficient to mitigate his concerns regarding her reactive behaviors. Mother also recognized that she did not properly handle conflict with Father or the children in the past and is now better at coparenting and handling arguments with the children.

{¶ 32} Father's hostile bias toward Mother as described in Dr. Kennedy's report is evidenced by his reporting Mother to Children's Services for child abuse ten times in nine months, each time resulting in unsubstantiated allegations. There is no evidence Mother has willfully denied Father parenting time with the children. In fact, Father acknowledged Mother's flexibility with his parenting time and testified she has never deprived him of his parenting time. By contrast, Father willfully denied Mother parenting time with the children when he withheld the children from Mother for four weeks. Father considered his withholding to be absolutely appropriate and vowed to do it again if need be.

{¶ 33} The fact that Father loves his children and wants to be with them does not change this decision. This is because, as noted above, the primary concern is the children's best interest, not whether Father loves, cares for, and wants to be with them. *See Hall v. Hall*, 12th Dist. Butler No. CA2018-05-091, 2019-Ohio-81, ¶ 26 (a father's "wishes about the care and control of his children * * * should not be placed above the children's best interests").

{¶ 34} After carefully reviewing the record and considering the foregoing, we find that the trial court weighed all appropriate R.C. 3109.04(F) factors in reaching its custody decision. The trial court did not abuse its discretion in designating Mother as the residential parent and legal custodian of the parties' three children.

{¶ 35} Father's first assignment of error is overruled.

{¶ 36} Assignment of Error No. 2:

{¶ 37} THE TRIAL COURT ERRED BY FAILING TO GIVE APPELLANT CREDIT FOR PAYMENTS HE MADE UNDER THE TEMPORARY ORDER.

{¶ 38} Father challenges the spousal support award, arguing that the trial court erred when it failed to give him credit for the "substantial payments" he made during the divorce proceedings pursuant to the trial court's temporary orders. Conceding that the trial court is not required to give credit for payments made under a temporary order, Father nevertheless asserts the court erred by not considering the payments "in some fashion" because they were "in lieu of temporary spousal support and other financial support." Father seeks a credit against his spousal support obligation for the payments he made under the temporary orders, or alternatively, suggests that the 48-month spousal support obligation be reduced to 24 months.

{¶ 39} There were three temporary orders and a final order during the pendency of the case:

- The September 24, 2019 temporary order, designating Mother as residential parent of the children and ordering Father to pay $1,571.01 per month in child support. At the time, the parties were both residing in the marital home.

- The October 8, 2019 temporary order, modifying the temporary order above, designating both parties as residential parents for the children, suspending Father's temporary child support obligation, and ordering him to pay all household expenses and the car payments for the Hummer driven by Mother. At some point, Father vacated the marital home and Mother was granted exclusive use of the house on December 5, 2019.

- The June 24, 2021 temporary order, modifying the October 2019 order above and ordering Father to pay Mother $1,000 a month beginning December 1, 2020, with credit for payments made by Father after December 1, 2020, for real estate taxes, mortgage, Hummer payments, and other household expenses.

- The May 16, 2022 final decree of divorce ordering Father to pay Mother $1,056.71 per month in child support effective January 1, 2021, and $600 per month in spousal support for 48 months effective November 1, 2021.

{¶ 40} "A trial court has broad discretion in determining whether to award spousal support, as well as the amount and duration of such award, based on the facts and circumstances of each case." *Spillane v. Spillane*, 12th Dist. Butler No. CA2019-12-206, 2020-Ohio-5052, ¶ 12. Absent an abuse of discretion, a spousal support award will not be disturbed on appeal. *Id.* "A trial court has a statutory duty to base a spousal support award order on a careful and full balancing of the factors in R.C. 3105.18(C)(1)." *Macknight v. Macknight*, 12th Dist. Butler No. CA2021-07-078, 2022-Ohio-648, ¶ 47.

{¶ 41} In support of his argument, Father cites *Mullett v. Mullett*, 9th Dist. Summit No. 28512, 2017-Ohio-7152, and *Falah v. Falah*, 9th Dist. Medina No. 15CA0039-M, 2017-

Ohio-1087.

{¶ 42} In *Mullet*, the wife appealed the trial court's refusal to credit her for the mortgage payments she made pursuant to the court's temporary orders and which resulted in an increase in equity in the marital home. In reversing the trial court's decision, the Ninth District Court of Appeals noted that no temporary support orders were issued in the case, that the bulk of the marital property was divided equally and the only remaining large assets were the marital home, the parties' business and the land on which it was located, and the wife's inheritance (her separate property), that the husband received the business, a larger interest in the land, and half of the net proceeds from the sale of the marital home, that the wife made the mortgage payments from her inheritance and her share of marital gold, and that the husband did not present any evidence that his expenses increased after he vacated the marital home.

{¶ 43} We find that *Mullett* is inapplicable as it involved distribution and division of marital property, and not spousal support. Division of marital property is controlled by R.C. 3105.171; spousal support is subject to a different analysis under R.C. 3105.18. *See Jones v. Jones*, 4th Dist. Highland No. 20CA3, 2021-Ohio-1498 (a trial court that is dividing marital property has discretion to consider payments a party made pursuant to temporary orders).

{¶ 44} In *Falah*, the husband paid $10,500 in spousal support during the divorce proceedings pursuant to the trial court's temporary orders. In the final divorce decree, the trial court assigned all marital debts to the husband, vacated the temporary spousal support order, awarded spousal support to the wife, and applied a $37,250 credit towards the husband's permanent spousal support obligation representing the amount he paid on the wife's dowry. The Ninth District Court of Appeals reversed the trial court's decision because the record did not reflect that the trial court considered the temporary spousal support payments made by the husband in crafting the permanent spousal support order:

The court vacated the magistrate's temporary spousal support order, but, at that point in time, Husband had already paid Wife over $10,500 in temporary support. The court neglected to address those payments. In light of the fact that the court vacated the temporary support order, we must conclude that it acted unreasonably in failing to address the temporary support that Husband had already paid. Consequently, we must remand this matter for the court to address the temporary support Husband paid in light of its decision to vacate the order for temporary support.

*Falah v. Falah*, 2017-Ohio-1087 at ¶ 28.

{¶ 45} We find that *Falah* is inapplicable. Unlike in *Falah*, Father's argument is not that the trial court failed to consider the payments he made pursuant to the temporary orders, but that he should receive some credit for those payments. Furthermore, *Falah* does not stand for the proposition that a spouse is entitled to credit against a spousal support obligation for temporary spousal support paid during the pendency of the divorce. *Falah* only suggests that such temporary payments may be considered by the trial court. We note that no Ohio courts of appeals, including the Ninth District, has cited *Falah* for the proposition that temporary spousal payments must be considered in crafting a final spousal support order.

{¶ 46} The record shows that the trial court considered and discussed all of the R.C. 3105.18(C)(1) factors in determining the amount and duration of Father's spousal support obligation. The factors having the greatest weight are the disparity in the parties' incomes (Father's income is $92,000; Mother's income is $29,000), the parties' 13-year marriage, and the fact Mother was a stay-at-home parent for most of the marriage. Consideration of temporary payments during divorce proceedings is not enumerated as a spousal support factor in R.C. 3105.18(C)(1). Regarding the catchall "any other factor" set forth in R.C. 3105.18(C)(1)(n), the trial court noted, "No testimony on any other relevant factor." The trial court's failure to explicitly mention the temporary payments made by Father does not

- 16 -

mean that the trial court did not consider those payments when it crafted the final spousal support order, especially considering the court was aware of those payments, having made the original order and then twice modifying the order during the pendency of the case.

{¶ 47} Additionally, Father ignores that Mother served as residential parent for the children for the majority of the case (i.e., from December 2019 forward) with no child support. Although the September 24, 2019 original temporary order required Father to pay temporary child support of $1,571.01 per month, that order was modified two weeks later on October 18, 2019, Father's child support obligation was suspended, and Father was ordered to pay household and Hummer expenses. On the date she filed her complaint for divorce, Mother moved for temporary support as follows: "Plaintiff requests that the Court order the Defendant to continue pay for the household and marital expenses, including Plaintiff's [Hummer] payment, and pay Plaintiff $500 per month, or in the alternative, order Defendant to pay spousal support in the amount of $2,100 per month." In only granting Mother's request that Father pay the household expenses and Hummer payments, the magistrate's October 18, 2019 order implicitly denied Mother's request for temporary spousal support. Thus, contrary to Father's assertion, the payments Father made to Mother during the pendency of this case are as likely in lieu of child support as in lieu of spousal support.

{¶ 48} Finally, we note that Father did not seek credit in the trial court for the payments he made pursuant to the trial court's temporary orders. In particular, when the magistrate's June 24, 2021 order granted Father credit for any payments made by him after December 1, 2020, Father did not request that the credit extend to payments he had made before December 1, 2020, and did not challenge the magistrate's failure to so extend the credit. The issue of credit appeared for the first time in Father's objections to the magistrate's decision. The record also shows that while Father briefly testified about some

payments he made during the divorce proceedings, he did not produce any documentary evidence showing what he was ordered to pay, the exact amount of what he was required to pay, and what he actually paid.

{¶ 49} In light of the foregoing, we find that the trial court did not abuse its discretion in awarding Mother $600 per month in spousal support for 48 months and failing to credit Father for the payments he made during the divorce proceedings pursuant to the trial court's temporary orders.

{¶ 50} Father's second assignment of error is overruled.

{¶ 51} Assignment of Error No. 3:

{¶ 52} THE TRIAL COURT ERRED IN FINDING APPELLANT IN CONTEMPT.

{¶ 53} Father argues the trial court abused its discretion by finding him in contempt for denying Mother parenting time with the children from mid-December 2020 until mid-January 2021.

{¶ 54} Contempt of court is defined as "disobedience of an order of a court * * * which brings the administration of justice into disrespect, or which tends to embarrass, impede or obstruct a court in the performance of its functions." *Sparks v. Sparks*, 12th Dist. Warren No. CA2010-10-096, 2011-Ohio-5746, ¶ 11, quoting *Windham Bank v. Tomaszczyk*, 27 Ohio St.2d 55 (1971), paragraph one of the syllabus. To establish contempt, a party must prove by clear and convincing evidence that a valid court order exists, that the offending party had knowledge of the order, and that the offending party violated such order. *Hetterick v. Hetterick*, 12th Dist. Brown No. CA2012-02-002, 2013-Ohio-15, ¶ 35.

{¶ 55} The magistrate held a parenting time hearing on December 17, 2019. Father and Mother were present at the hearing. Pursuant to the magistrate's December 18, 2019 order, Father had parenting time with the children on Tuesdays and Thursdays after school until 8:00 p.m. and every other weekend from Friday after school until Sunday at 6:00 p.m.

- 18 -

The parties followed the order without incident until mid-December 2020 when Father withheld all three children from Mother until mid-January 2021. The record supports a finding that the three elements of contempt were met: there was an existing court order for parenting time; Father had knowledge of the order; and he violated the order by taking action that prevented Mother from exercising her parenting time.

{¶ 56} Father argues, however, that he was justified in withholding the children from Mother because he had a reasonable, good faith belief he was protecting the safety of the children in light of the physical altercation between Mother and Leo and the Children's Hospital's "diagnosis of suspected child abuse." Father further claims justification based upon Dr. Kennedy's report, which was issued in March 2021.

{¶ 57} A residential parent may have a defense in a contempt proceeding for interference with parenting time if he or she has a reasonable, good faith belief that he or she must deny visitation to protect the safety of the child. *Brennan v. Brennan*, 5th Dist. Muskingum No. CT2020-0047, 2021-Ohio-1865, ¶ 37; *Steele v. Steele*, 2d Dist. Montgomery No. 25713, 2013-Ohio-3655, ¶ 20. A trial court's finding of civil contempt will not be disturbed on appeal absent an abuse of discretion. *Hetterick*, 2013-Ohio-15 at ¶ 37. A "trial court does not abuse its discretion in denying the good-faith defense when the trial court properly exercises its discretion to consider all surrounding circumstances and weigh all factors in deciding whether a parent is in contempt." *In re J.H.P.*, 2d Dist. Montgomery No. 26097, 2015-Ohio-548, ¶ 19; *Hensley v. Hensley*, 6th Dist. Erie No. E-08-026, 2009-Ohio-1738, ¶ 26. Courts have considered and may consider a parent's subsequent actions taken to protect the child from the perceived threat in determining whether the belief is reasonable and whether the parent violated the court order in a good faith attempt to protect the child. *Hensley* at ¶ 28, 30.

{¶ 58} In determining that Father was in contempt of court, the magistrate found that

"Father inappropriately withheld the children from Mother for a month. These children missed parenting time with their Mother during a Christmas season. There is simply no excuse for Father's denial of this time." The trial court upheld the contempt finding on the ground that "the unilateral decision of [Father] to withhold parenting time as described on the record when coupled with his lack of remorse for his decision to violate a court order is not defensible."

{¶ 59} We find that the trial court did not abuse its discretion in rejecting Father's good-faith defense and in finding Father in contempt of court for denying Mother's parenting time with the children for approximately four weeks. Although the Children's Hospital's visit summary listed "suspected physical abuse" as one of Leo's four diagnoses, the summary made no mention of injury or the allegations of physical abuse and did not include a substantiation of physical abuse. Father testified that following the visit to Children's Hospital, a social worker reported the "suspected physical abuse" to Children's Services, triggering an investigation, and that the suspected physical abuse was ultimately found to be unsubstantiated. Although Father subsequently moved to suspend Mother's parenting time "until a hearing can be held on this matter," his brief indicates that a hearing "could not be scheduled on an immediate basis." Father never moved for an emergency hearing or an emergency order, either prior to unilaterally withholding the children from Mother or after moving to suspend Mother's parenting time.

{¶ 60} During the June 2021 hearing, Father admitted contacting Children's Services ten times in the past nine months and conceded that the abuse allegations were never substantiated. Father testified that his interference with Mother's parenting time for approximately four weeks was absolutely appropriate, that he would absolutely do it again, and that Mother was not entitled to have her lost parenting time made up.

{¶ 61} Father claims justification based upon Dr. Kennedy's post-altercation report,

in particular its description of Mother's relationship with the children as toxic. However, in that report, Dr. Kennedy also stated that it does not matter to Father whether the abuse allegation was unsubstantiated because he believes that Mother routinely engages and has engaged in abusing the children, regardless of previous unsubstantiated allegations. Father's belief is such that he is unable to consider any possible alternate explanations and is unlikely to consider the veracity or motives behind any negative comments made by the children about Mother. Dr. Kennedy testified he did not see any reportable issues involving abuse. Furthermore, he was informed by a Children's Services representative that multiple investigations had been opened in the past, that all were closed as being unfounded, and that there were no pending, open investigations. There is no evidence in the record that the children have been abused or mistreated while in Mother's care during her parenting time.

{¶ 62} In light of the foregoing, the trial court's rejection of Father's good-faith defense and finding Father in contempt of court was not unreasonable, arbitrary, or unconscionable. Father's third assignment of error is overruled.

{¶ 63} Judgment affirmed.

S. POWELL, P.J., and HENDRICKSON, J., concur.