[Cite as *Konrad v. Konrad*, 2025-Ohio-5691.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

|  |  |  |
|---|---|---|
| MARK N. KONRAD, SR., | : | |
| Appellant, | : | CASE NO. CA2024-06-040 |
| - vs - | : | <u>OPINION AND JUDGMENT ENTRY</u> 12/22/2025 |
|  | : | |
| SHERRY M. KONRAD, | : | |
| Appellee. | : | |

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. 2020-DRB-00484

T. David Burgess Co., L.P.A., and T. David Burgess, for appellant.

Sherry M. Konrad, pro se.

# **O P I N I O N**

**BYRNE, J.**

{¶ 1} Appellant, Mark N. Konrad, appeals from the decree of divorce issued by the Clermont County Court of Common Pleas, Domestic Relations Division, which terminated his marriage to appellee, Sherry M. Konrad.[1] Mark appeals the portions of the

---

1. Sherry filed a "Motion and Memorandum in Support" in the domestic relations court on June 6, 2024. The domestic relations court construed Sherry's motion as a timely notice of cross-appeal pursuant to

divorce decree that awarded spousal support to Sherry; divided the marital and separate property; and credited Sherry for improvements made to the marital home. For the reasons outlined below, we affirm the decision of the domestic relations court.

## I. Factual Background

{¶ 2}   Mark and Sherry were married on June 26, 1995. There were no children born issue of the marriage, though Mark has an adult son from a previous relationship. The parties officially separated in April 2020 and Mark filed for divorce from Sherry in the Clermont County Court of Common Pleas, Domestic Relations Division, on April 15, 2020. Sherry filed an answer and counterclaim for divorce on June 23, 2020.

{¶ 3}   Shortly after the parties married, Mark's grandmother died. As part of her last will and testament, Mark inherited $250,000. The entirety of his inheritance was invested in stocks and bonds, which Mark withdrew from periodically during his marriage to Sherry. On one such occasion, in 2001, Mark withdrew $65,000 to purchase a home at 4273 Moore Marathon Road in Goshen, Ohio ("the marital home"). Mark used $60,000 towards the purchase price of the home, while the remaining $5,000 was paid towards "expenses and . . . certain costs of buying a home."

{¶ 4}   In April 2020, Mark moved out of the marital home and purchased a motor home, which did not run, for $500. Mark then moved into the motor home, which was parked on his son's property, while Sherry continued to reside in the marital home. While

---

App.R. 3. However, we note that the domestic relations court did not have authority to construe Sherry's post-decree motion as a timely notice of appeal. *See Landmark Am., Inc. v. Jeries*, 2009-Ohio-6709, ¶ 44 (11th Dist.); App.R. 3(D). Sherry also filed a motion for delayed appeal with this court, which we denied on the basis that delayed appeals are unavailable in civil matters. *See* App.R. 5. Regardless, Sherry failed to participate in the appellate proceedings in that she did not file a brief in her cross-appeal and did not respond to Mark's appellant's brief. As such, Sherry has presented no assignments of error for this court to consider in any cross-appeal. Sherry also failed to respond to this court's show cause order issued in September 2024, which ordered Sherry to show cause as to why this case should not proceed on Mark's brief alone. Because Sherry failed to respond or otherwise participate in the proceedings, we will not address any potential arguments she could have raised in her cross-appeal or the arguments she raised in her motion and memorandum filed below.

the divorce was pending, Sherry made various improvements to the interior and exterior of the marital home, and Mark continued to pay the mortgage. As of August 2022, the marital home had an appraised value of $93,000.

## II. Procedural History

### A. Temporary Order, Stay, and Discovery

{¶ 5}   In July 2020, a magistrate issued a temporary order requiring, in relevant part, that Mark pay Sherry temporary spousal support in the amount of $612 per month. Thereafter, in September 2020, the magistrate held a hearing regarding the temporary order. After considering the evidence presented at the hearing, the magistrate issued an order finding that (1) Mark would continue to pay the mortgage and insurance on the marital home and (2) effective October 1, 2020, there was no spousal support ordered.

{¶ 6}   In April 2021, Sherry filed for bankruptcy. As a result, the domestic relations court stayed the divorce proceedings until the bankruptcy was finalized in December 2021. At that point, the parties exchanged discovery and scheduled the deposition of Russ Canter, Jr., a certified appraiser with the State of Ohio who conducted the appraisal of the marital home in August 2022. Canter's deposition was videotaped and transcribed.

### B. Final Hearing

{¶ 7}   The matter proceeded to a final hearing before the magistrate on April 13, 2023. Mark was represented by counsel while Sherry elected to proceed pro se. The magistrate heard testimony from the parties and several additional witnesses, including Sherry's former employer and Mark's adult son. The magistrate also heard testimony from three of Sherry's friends: Tiffany Blankenship, Rebecca Miller, and Brenda Meeks. Mark played part of Canter's videotaped deposition during the presentation of his case and introduced several exhibits for the court's consideration. Sherry also proffered various exhibits, but due to her failure to comply with the court's local rules, Sherry's exhibits were

not admitted into evidence or considered by the magistrate.[2]

**C. The Magistrate's Decision**

{¶ 8} On May 2, 2023, the magistrate issued a decision granting Mark and Sherry a divorce on the grounds of incompatibility. In so doing, the magistrate found that the proper termination date of the marriage was April 20, 2020, when Mark moved out of the marital home. The magistrate divided the marital assets and liabilities, including the parties' personal property, household goods, and debts, and ordered Mark to pay spousal support to Sherry. The magistrate also awarded the marital home to Sherry, subject to Mark's one-half interest in the property.

{¶ 9} In dividing the marital assets and liabilities, the magistrate determined that Mark would retain the balance of his inherited funds, which totaled $53,000 at the time of the hearing, free of any claims from Sherry. The magistrate also found that Mark was entitled to the $60,000 of separate inherited funds he contributed to the purchase of the marital home. The magistrate awarded the marital home to Sherry, provided she could refinance the home's mortgage and pay Mark for his interest in the real estate. If Sherry could not refinance the mortgage, then she and Mark were to list the marital home for sale pursuant to the terms set forth by the court. The magistrate ordered Mark to pay the mortgage, taxes, and insurance until the closing of the refinance or until the home was sold. If the martial home was sold, Mark was to receive $60,000 from the proceeds before the remaining net proceeds were divided equally between the parties.

---

2. During the hearing, it was revealed that Sherry failed to exchange her exhibits with Mark's counsel as required by Loc. R. 13. As such, the magistrate determined the court would not consider the exhibits.

**D. The Parties' Objections to the Magistrate's Decision**

{¶ 10} Sherry and Mark filed objections to the magistrate's decision.[3] Relevant to the instant proceedings, Mark claimed the magistrate erred by (1) failing to credit Mark for the mortgage payments he made while the case was pending and Sherry resided in the marital home; (2) failing to consider Sherry's alleged gambling problem; (3) awarding the marital home to Sherry while requiring Mark to continue paying the mortgage, taxes, and insurance; (4) ordering Mark to pay spousal support; and (5) considering Sherry's exhibits. Mark later filed supplemental objections to the magistrate's decision, wherein he argued the magistrate erred in failing to find financial misconduct on the part of Sherry. Mark also argued the magistrate should have deemed an additional $7,000 as his separate property, as Mark asserted he withdrew that money from his inheritance and used it to pay Sherry's father for repairs to the marital home.

**E. The Domestic Relations Court's Decision and the Final Decree of Divorce**

{¶ 11} On December 14, 2023, the domestic relations court issued a decision ruling on Mark and Sherry's objections to the magistrate's decision. In its decision, the court largely incorporated by reference the findings of the magistrate but amended the disposition of the marital home. In so doing, the court found that Mark should retain the marital home, not Sherry, and that the magistrate had miscalculated Sherry's one-half interest in the real estate. Specifically, the court found the magistrate correctly subtracted $60,000 from the value of the marital home as Mark's separate property but incorrectly stated that Sherry was entitled to $5,335.50 for her share of the marital equity. Instead, the court found Sherry's share totaled $6,823.00. As such, the court amended the decision of the magistrate to reflect that Mark would pay Sherry her portion of the marital

---

3. Sherry's objections are not relevant to the instant appeal.

equity and that Sherry would vacate the residence. In all other respects, the court overruled the parties' objections and adopted the decision of the magistrate.

{¶ 12} On May 7, 2024, the trial court issued a decree of divorce. Mark timely filed an appeal and Sherry attempted to file a cross-appeal. Following briefing, this court held oral argument on the matter. Sherry failed to participate in any briefing or oral argument. This court proceeded on Mark's appeal alone. Mark's appeal is now properly before this court for decision.

### III. The Appeal

{¶ 13} Mark raises four assignments of error for this court's review. In his assignments of error, Mark challenges the domestic relations court's spousal support award, the disposition of the marital home, and the court's classification of the parties' marital and separate property. We will discuss each of Mark's arguments in turn.

### A. Spousal Support Award

{¶ 14} Mark's Assignment of Error No. 1 states:

THE TRIAL COURT ERRED BY GRANTING SPOUSAL SUPPORT.

{¶ 15} In his first assignment of error, Mark argues the domestic relations court's decision awarding spousal support to Sherry was an abuse of discretion in that it was against the manifest weight of the evidence.[4] In support, Mark claims the court did not consider each of the requirements of R.C. 3105.18 when determining that spousal support was appropriate. Specifically, Mark argues the court failed to consider (1) Sherry's additional income from cleaning houses, (2) Sherry's gambling problem and financial

---

4. Although Mark repeatedly references the "manifest weight of the evidence" standard of review in his first assignment of error, and states that "the trial court's decision was against the manifest weight of the evidence," this is the incorrect standard of review for spousal support orders. It is well settled that we review a domestic relations court's decision to award spousal support under an abuse of discretion standard. *See Price v. Price*, 2025-Ohio-2479, ¶ 31 (12th Dist.); *Porter v. Porter*, 2024-Ohio-1413, ¶ 20 (12th Dist.).

misconduct, and (3) Mark's physical condition after his lung removal.

{¶ 16} "A trial court has broad discretion in determining to award spousal support as well as the amount and duration of such award, based on the facts and circumstances of each case." *Spillane v. Spillane*, 2020-Ohio-5052, ¶ 12 (12th Dist.), citing *Curry v. Curry*, 2017-Ohio-8127, ¶ 15 (12th Dist.). Absent an abuse of discretion, a spousal support award will not be disturbed on appeal. *Macknight v. Macknight*, 2022-Ohio-648, ¶ 46 (12th Dist.).

{¶ 17} "A trial court has a statutory duty to base a spousal support award order on a careful and full balancing of the factors in R.C. 3105.18(C)(1)." *Id*. at ¶ 47. The factors enumerated in R.C. 3105.18(C)(1) include:

> (a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
>
> (b) The relative earning abilities earning abilities of the parties;
>
> (c) The ages and the physical, mental, and emotional conditions of the parties;
>
> (d) The retirement benefits of the parties;
>
> (e) The duration of the marriage;
>
> (f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
>
> (g) The standard of living of the parties established during the marriage;
>
> (h) The relative extent of education of the parties;
>
> (i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
>
> (j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

R.C. 3105.18(C)(1)(a)-(n).

{¶ 18} In this case, the court adopted the magistrate's findings of fact, which explicitly analyzed each of the R.C. 3105.18(C)(1) factors. Regarding the parties' incomes, the magistrate found that, in addition to an undisclosed amount of unemployment compensation, Mark earned $22,549 in 2020 from his employment as a truck driver and expected to earn that amount every year. The magistrate further found that Sherry's income consisted of Social Security benefits in the amount of $1,020 monthly, or $12,240 annually. Based upon this disparity in the parties' incomes, as well as the duration of the marriage, the magistrate determined it was appropriate, reasonable, and equitable to equalize the parties' incomes through a spousal support award to Sherry. Based upon these findings, the court ordered Mark to pay Sherry $500 per month in spousal support for a period of ten years.

**1. Additional Income from Cleaning Homes**

{¶ 19} Mark first argues the court should have considered Sherry's ability to earn additional income before finding that a spousal support award was appropriate and reasonable. Mark relies entirely upon the testimony of Angela Mitchell, Sherry's former employer, to support his argument. At the hearing, Angela testified that she had known

Sherry since 1989. Angela further testified that approximately one year before the pandemic, Sherry began assisting Angela in her cleaning business. Sherry helped Angela clean homes "mainly every day," earning between $45 and $60 per day. According to Angela, Sherry last worked for her in December 2019. During that time, Angela believed Sherry was receiving her disability income.

{¶ 20} Based upon Angela's testimony, Mark argues the court should have considered that Sherry could earn an additional $40 to $65 per day, thereby increasing her income between $10,000 and $16,250 per year. When considering this additional income, Mark claims "the party's [sic] income would be equal or more for Sherry and an order for Spousal support is unwarranted." We find no merit to Mark's argument.

{¶ 21} As an initial note, although Angela testified that she employed Sherry as recently as 2019, Sherry denied working for Angela in 2019, and testified she only worked for Angela in 2015 for approximately six months. Sherry's friend, Tiffany, also testified that, although Sherry had cleaned homes at some point, she was unemployed at the time of the hearing. Sherry likewise disputed that she was paid between $45 and $60 per day. Instead, Sherry testified she made "20 bucks here and there" from the cleaning. Sherry reiterated that her income consisted of the Social Security disability benefits she received each month. At the time of the hearing, those benefits totaled $1,020 per month.

{¶ 22} After our review, the court did not abuse its discretion in limiting its consideration of Sherry's income to the $1,020 of Social Security benefits she receives each month. When considering the above, and contrary to Mark's claims otherwise, the parties presented conflicting evidence regarding Sherry's employment with Angela, including the recency of any such employment, as well as the amount she earned from that employment and the frequency of work she provided. It is the function of the trier of fact to determine witness credibility and the weight to be given to testimony. *Rigby v.*

*Rigby*, 2021-Ohio-271, ¶ 29 (12th Dist.). This includes resolving conflicts in the evidence.

{¶ 23} Based upon the magistrate's decision, the magistrate apparently did not believe that Sherry was earning additional income from cleaning houses at the time of the hearing. This is particularly evident given the magistrate's consideration of Sherry's history of cleaning homes in its analysis of her relative earning ability, but not in its analysis of her income. As noted above, the court was free to determine what weight to give to the evidence presented. *Id*.

### 2. Sherry's Alleged Financial Misconduct

{¶ 24} Mark next argues the domestic relations court abused its discretion when it failed to consider Sherry's gambling problem in its spousal support determination. In support of his claim, Mark points to his testimony that Sherry used marital funds, without his knowledge or consent, to fund her gambling habits or other non-marital activities. According to Mark, Sherry covertly used various credit cards in her name, as well as money from mortgages taken out on the marital home, for non-marital purposes. During his testimony, Mark claimed he was unsure how Sherry acquired such significant debt, or spent such significant funds, but it could have been from gambling. In any event, Mark claimed Sherry's actions resulted in unnecessary mortgages on the marital home and the accrual of significant credit card debt.

{¶ 25} In response, Sherry denied accruing significant non-marital or gambling debt. Instead, she presented evidence that Mark was aware of her gambling habit, oftentimes provided her with money to engage in that habit, and did not have any issue with her gambling during the marriage. Sherry also claimed Mark was aware of her credit card debt and often instructed her to make certain purchases. According to Sherry, she accrued most of the credit card debt—which was discharged entirely in the bankruptcy proceedings—from paying the marital bills while Mark was sick and hospitalized.

{¶ 26} After our review of the record, we find no merit to Mark's argument. As an initial note, while a domestic relations court may consider any factors it considers relevant, a party's financial misconduct or alleged gambling problem are not factors that must be considered under R.C. 3105.18(C)(1). However, even if the court were to consider Mark's allegations of financial misconduct, we find the record lacks any evidence that Sherry actually engaged in financial misconduct during the marriage. That is, the record does not reveal any evidence concerning the amount of money Sherry allegedly lost due to her gambling, nor does the record reflect, aside from Mark's speculation, that Sherry misappropriated marital funds to sustain her gambling habits or other, unspecified, non-marital activities.[5] Mark's vague statement that he did not know where certain marital funds went after they were deposited to the couple's joint bank account is insufficient to prove Sherry used those funds inappropriately. Given these facts, the court did not act unreasonably, arbitrarily, or unconscionably by declining to consider any alleged financial misconduct on the part of Sherry when awarding spousal support in her favor.

### 3. Consideration of Mark's Physical Ailments

{¶ 27} Lastly, Mark claims the domestic relations court abused its discretion by failing to consider his physical condition, specifically his lung removal, in its spousal support analysis. After a careful review of the magistrate's decision, which was adopted by the domestic relations court, it is evident the court *did* consider Mark's physical condition when crafting its spousal support award, but gave more weight to Mark's consistent income, despite his health conditions. Specifically, there was testimony that Mark suffers from ADD, had a lung removed at some point, and was "sick" in 2010 and 2016. Despite these ailments, Mark testified that he works for a trucking company and is

---

5. In fact, Mark presented testimony from Angela, who stated that Sherry "would win more than she would lose" and would "hit jackpots" often.

- 11 -

paid a percentage of each job. In 2020, his income was $22,549, which he explained was "fairly close" to what he makes yearly. According to Mark, although his income fluctuates by the year, $22,549 was a fairly accurate number for his income in 2020, 2021, 2022, and 2023. Notably, there was no evidence that Mark's physical impairments, including his lung removal, impacted his ability to work or his future income.

{¶ 28} In light of the foregoing, we find that the domestic relations court did not abuse its discretion in awarding Sherry spousal support of $500 a month for ten years. The court reviewed all the relevant R.C. 3105.18(C)(1) factors in determining the amount and duration of the spousal support award, and its decision is supported by competent and credible evidence. On appeal, Mark ultimately disagrees with the weight the domestic relations court afforded the applicable factors and the conclusions it drew from the evidence. However, disagreement alone is insufficient to demonstrate that the court abused its discretion. *Spillane*, 2020-Ohio-5052 at ¶ 32.

{¶ 29} We overrule Mark's first assignment of error.

### B. The Court's Disposition of the Marital Home

{¶ 30} Mark's Assignment of Error No. 2 states:

> THE TRIAL COURT ERRED BY NOT GRANTING CREDITS FOR MORTGAGE PAYMENTS.

{¶ 31} Mark's Assignment of Error No. 3 states:

> THE TRIAL COURT ERRED BY IN [sic] OFF SETTING IMPROVEMENTS TO APPELLEE WITHOUT PROOF AS TO THE AMOUNT.

{¶ 32} In his second and third assignments of error, Mark argues the domestic relations court erred in its division of the marital property. Mark takes particular issue with the court's disposition of the marital home, wherein it concluded the parties had contributed equally to the preservation of the marital home, and therefore neither would

be reimbursed for those contributions. Instead of "equal contribution," Mark believes he is entitled to a "credit" of $18,922.00 for the mortgage payments he made pursuant to the magistrate's temporary orders. Mark further claims that any improvements Sherry made to the home should not offset those mortgage payments without evidence of their value.

{¶ 33} In divorce proceedings, the Revised Code requires the domestic relations court to determine what constitutes marital property and what constitutes separate property. R.C. 3105.171(B). After making this determination, the court then must equitably divide the marital property and separate property between the spouses in accordance with the provisions of R.C. 3105.171. *Id*.

{¶ 34} After the domestic relations court has classified property as marital or separate, it possesses broad discretion to determine an equitable and fair division of the marital estate. *Bauer v. Bauer*, 2020-Ohio-425, ¶ 22 (12th Dist.), citing *Cherry v. Cherry*, 66 Ohio St.2d 348, 355 (1981). This court will not reverse a domestic relations court's decision regarding the division of property in a divorce proceeding absent an abuse of discretion. *Id*. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 35} As discussed above, in September 2020 the magistrate issued a temporary order which required Mark to pay the mortgage and insurance on the marital home and eliminated his temporary spousal support obligation. At the hearing, Mark testified that he had made every mortgage payment since April 2020. Between May 2020 and August 2022, he paid $612 per month. In September 2022 the mortgage decreased to $482 per month, which Mark continued to pay until the hearing in April 2023. According to Mark, this amounts to more than $18,000 that he paid towards the mortgage.

{¶ 36} At the hearing, Sherry testified that, although she had not paid the mortgage, she paid all other costs associated with living in the marital home, including

the cost of several home renovations. Sherry presented evidence that, since the parties' separation, she had installed new cabinets and a shower; repaired the floors and subfloors; fixed the roof; replaced the gutters; and replaced the furnace and air conditioning unit. Sherry testified she completed the above improvements without assistance from Mark.[6]

{¶ 37} In its decision, the magistrate considered the above evidence when detailing its disposition of the marital home. In so doing, the magistrate stated that "the parties equally contributed to the preservation of the real estate as a valuable marital asset. Mark will not be reimbursed for his [mortgage] payments and Sherry will not be reimbursed for her improvements." This provision of the magistrate's decision was adopted by the domestic relations court over the parties' objections.

{¶ 38} On appeal, Mark claims the mortgage payments he made while the case was pending should have been considered by the domestic relations court and "credited" to him. In support, Mark relies upon the Ohio Supreme Court's decision in *Bentz v. Bentz*, 171 Ohio St. 535 (1961). In *Bentz*, the supreme court held that payments of temporary alimony for sustenance made "during the pendency of an appeal from a final decree for divorce and alimony must, on the affirmance of that decree, be credited against obligations imposed by the final decree." *Bentz* at 543.

{¶ 39} After our review, we find *Bentz* distinguishable from the case at hand. Unlike the situation in *Bentz*, this case does not involve payments made during the pendency of any appeal from the final decree for divorce, nor does it involve temporary alimony payments that must be credited against an existing permanent alimony obligation. Instead, this case concerns mortgage payments Mark made pursuant to the magistrate's

6. Sherry attempted to introduce receipts for some of her home improvements as exhibits, however, those exhibits were not admitted into evidence or considered by the court.

September 2020 temporary order, which was terminated at the time the final decree was entered. Thus, unlike the payments made in *Bentz*, no permanent order for spousal support exists in this case against which Mark's mortgage payments must be credited.

{¶ 40} In his argument, Mark does not identify how the credit he seeks should be applied, or whether it be allocated towards his equity in the marital home or against his spousal support obligation. Nevertheless, and as this court has noted previously, a domestic relations court is not required to give credit for payments made pursuant to a temporary order of the court. *See Thompson v. Thompson*, 2023-Ohio-667, ¶ 38, 46 (12th Dist.); *see also Jones v. Jones*, 2021-Ohio-1498, ¶ 16 (4th Dist.) ("giving a party credit for payments made under temporary orders is not mandated"). Thus, although the court could have awarded credit to Mark for the mortgage payments he made under the magistrate's temporary orders, it was within its discretion not to do so. *Jones* at ¶ 16.

{¶ 41} Here, instead of giving Mark credit for the mortgage payments he made pursuant to the magistrate's temporary orders, the court offset those payments with the home improvements made by Sherry. Mark claims the court abused its discretion in this regard, because the court could not have considered Sherry's improvements without evidence of the value of any improvement she made to the marital home. While we acknowledge that Sherry's exhibits pertaining to the value of those improvements were not considered by the domestic relations court, there was significant testimony regarding the improvements Sherry made to the home. In fact, there was evidence that, prior to the improvements made by Sherry, the home was rather dilapidated. Mark fails to point to any evidence in the record suggesting the testimony of Sherry's witnesses was not truthful, nor does he even allege that the home improvements were not made or were worth less than the mortgage payments he made after April 2020. Upon this court's review of the record, we can also find no such evidence.

{¶ 42} Simply because Sherry did not produce receipts to quantify the costs associated with the improvements does not mean the court could not consider the witness testimony that the improvements were made and that they were extensive. As the trier of fact, the domestic relations court was free to believe Sherry and her witnesses when they described the significant improvements that had been made to the marital home. *Hatfield v. Cornell*, 2018-Ohio-798, ¶ 14 (12th Dist.).

{¶ 43} Therefore, under the facts and circumstances of this case, we find no error in the court's decision to offset Mark's mortgage payments with the improvements completed by Sherry. The court's decision was supported by competent and credible evidence in the record and was not arbitrary, unreasonable, or unconscionable given the facts of this case. This is particularly true where Mark retained possession of the marital home pursuant to the final decree, and therefore received the benefit of the reduced mortgage, as well as the improvements made by Sherry.

{¶ 44} Accordingly, we overrule Mark's second and third assignments of error.

### C. The Court's Classification of Marital and Separate Property

{¶ 45} Mark's Assignment of Error No. 4 states:

> THE TRIAL COURT ERRED BY NOT PROPERLY DIVIDING SEPARATE PROPERTY.

{¶ 46} In his final assignment of error, Mark argues the domestic relations court erred by not properly dividing his and Sherry's separate property.

{¶ 47} Under Ohio law, a party claiming a separate interest in property must establish that interest by a preponderance of the evidence. *Todor v. Ballesteros-Cuberos*, 2024-Ohio-4525, ¶ 9 (12th Dist.), citing *Peck v. Peck*, 96 Ohio App.3d 731, 734 (12th Dist. 1994). "This standard requires the claiming party to demonstrate that it is more likely than not that the asset in question is indeed separate property, rather than marital property

subject to division in the divorce proceedings." *Kochaliyev v. Kochaliyeva*, 2025-Ohio-1140, ¶ 23 (12th Dist.). Separate interests in property "may be commingled with marital property without losing its distinct status, provided . . . it remains traceable." *Id*., citing R.C. 3105.171(A)(6)(b).

{¶ 48} "Traceability presents a question of fact and we ordinarily defer to the trial court as the factfinder." *Humbarger v. Cassidy*, 2024-Ohio-5361, ¶ 15 (12th Dist.), citing *Maloney v. Maloney*, 2005-Ohio-1368, ¶ 23 (2d Dist.). "A trial court's classification of property as marital or separate is subject to the manifest-weight-of-the-evidence standard of review and will be upheld if it is supported by competent and credible evidence." *Todor* at ¶ 8.

{¶ 49} As discussed above, the testimony at the hearing revealed that Mark inherited $250,000 after the death of his grandmother. The sum of his inheritance was invested into stocks and bonds ("the trust account"), from which Mark withdrew during his marriage to Sherry. The magistrate determined that the $60,000 of inherited funds Mark used to purchase the marital home was his separate asset. The court likewise found that "the $60,000 remains [Mark]'s separate property as it was directly traceable. Accordingly, the magistrate was correct in subtracting $60,000 from the overall value as [Mark['s separate property."

{¶ 50} On appeal, Mark argues that the court should have considered an additional $12,000 of inherited funds as his separate property. Specifically, Mark claims $5,000 he used to purchase the marital home and $7,000 he loaned to Sherry's father are his separate property. We will discuss each of Mark's arguments in turn.

**1. $5,000 Paid Toward Expenses**

{¶ 51} Mark testified that in May 2001 he withdrew $65,000 from the trust account to purchase the marital home. According to Mark, he paid $60,000 toward the purchase

price of the home, while he thought the remaining $5,000 "was used for expenses and just certain costs of buying a home." Mark did not elaborate on what expenses or costs the $5,000 went towards. In support of his testimony, Mark submitted an account statement from the trust account, which verified the $65,000 withdrawal. Mark also submitted the deed to the marital home, which included a notation that he paid $60,000 for the martial home. Based upon this evidence, Mark claims the court should have considered the entire $65,000 as his separate property because "the exhibit admitted by the court shows $65,000.00 taken out of the account and used in the purchase of real estate."

{¶ 52} Although Mark testified he used the entire $65,000 towards purchasing the home, Mark's assertion is not otherwise supported by the record. That is, there is no evidence in the record to support that Mark paid more than $60,000 towards the marital home.[7] Mark did not produce any evidence regarding the additional $5,000 of expenses or costs associated with the purchase of the marital home, nor did he trace his inherited funds to the payment of any such costs or expenses. "[W]hile traceability of separate property may be established by the proponent's testimony alone, such testimony does not necessarily support the separate-property assertion adequately." *Urbanic v. Urbanic*, 2015-Ohio-1402, ¶ 9 (2d Dist.). Ultimately, the court concluded that Mark proved that only $60,000 is his separate property. In essence, then, the court found that Mark failed to show a connection between the remaining $5,000 and the purchase of the marital home. There is competent, credible evidence to support the domestic relations court's decision, so we will not disturb it.

---

7. We note that, in his objections to the magistrate's decision, Mark states that he "ha[d] $60,000.00 from inherited funds" invested in the marital home—not $65,000.00.

## 2. $7,000 Loan to Sherry's Father

{¶ 53} Mark also argues the domestic relations court erred in failing to consider $7,000 of inherited funds he loaned to Sherry's father as Mark's separate property. At the hearing, Mark testified that, in the year he "received [his] money," he lent Sherry's father $7,000 from the trust account to purchase a horse trailer with a camper. Sherry's father "never really paid back" the loan, so Mark agreed to accept remodeling on the marital home in lieu of repayment. According to Mark, he considered the two of them "square" after Sherry's father completed the remodeling work. Based upon this transaction, Mark claims the $7,000 should be considered his separate property, and he should be "credit[ed] for the loan forgiveness that went into the marital residence from the inheritance."

{¶ 54} It is well settled that "when one spouse contributes equity in the parties' marital home and that spouse can trace the equity to his or her [separate] funds, those funds remain the spouse's separate property." *Bauer*, 2020-Ohio-425 at ¶ 24, citing *Jones v. Jones*, 2008-Ohio-2476, ¶ 21 (4th Dist.). Based upon this principle, this court has held that improvements in the marital home that are clearly traced to a spouse's separate property remain separate property for purposes of dividing property in divorce proceedings. *Id*. at ¶ 32, 34; *see also Balser-LeForge v. LeForge*, 2003-Ohio-5878, ¶ 17 (12th Dist.). However, the party seeking to have a particular asset classified as separate property has the burden of proof to trace the asset to separate property. *Peck*, 96 Ohio App. 3d at 734.

{¶ 55} Based upon the above, if Mark clearly traced his separate funds used for making home improvements, those funds could be considered his separate property in the divorce proceedings. However, unlike the $60,000 Mark used to purchase the marital home, Mark failed to offer any evidence tracing $7,000 from the trust account to the

alleged improvements made on the marital home. Notably, Mark did not produce any evidence, through testimony or otherwise, as to what renovations were completed as a result of his agreement with Sherry's father. Additionally, Mark did not describe in any detail his father-in-law's repayment of the loan, stating only that Sherry's father "never really paid [him] back the money." Based upon this statement, it is unclear from the record what amounts were repaid to Mark in the form of home improvements and what amounts were repaid to Mark through other means. Given this lack of evidence, we conclude that Mark failed to demonstrate that it is more likely than not that he spent $7,000 of inherited funds toward the remodeling of the marital home. As such, Mark failed to prove he was entitled to an additional $7,000 as his separate property.

{¶ 56} Therefore, under these circumstances, we find no error in how the domestic relations court divided Mark and Sherry's separate property. The court was not obliged to accept Mark's attempt to trace the property, and there was competent, credible evidence to support the court's findings with respect to Mark's inheritance funds. The court's findings were not against the manifest weight of the evidence.

{¶ 57} Accordingly, we find no error in the domestic relations court's decision, and we overrule Mark's fourth assignment of error.

## IV. Conclusion

{¶ 58} Finding no merit to any of Mark's assignments of error discussed above, we affirm the judgment of the trial court.

{¶ 59} Judgment affirmed.

HENDRICKSON, P.J., and M. POWELL, J., concur.

# JUDGMENT ENTRY

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Clermont County Court of Common Pleas, Domestic Relations Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Mike Powell, Judge

/s/ Matthew R. Byrne, Judge